**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>Prime Core Technologies Inc., *et al.*,[1]<br><br>                      Debtors. | Chapter 11<br><br>Case No. 23-11161 (JKS)<br><br>(Jointly Administered) |
| PCT Litigation Trust,<br><br>                    Plaintiff,<br><br>    v.<br><br>Electric Solidus, Inc.,<br><br>                    Defendant. | Adv. Proc. No. 26-_____ (JKS) |

**COMPLAINT**

PCT Litigation Trust[2] ("Plaintiff" or "PCT") established in the above-captioned chapter 11

cases (the "Chapter 11 Cases"), through its undersigned counsel, files this complaint

(the "Complaint") against Defendant Electric Solidus, Inc. f/d/b/a Electric Solidus, LLC f/k/a

GiveBitcoin d/b/a Swan Bitcoin d/b/a Swan BTC a/k/a Swan[3] ("Defendant" or "Swan"), seeking

---

[1]  The debtors in the Chapter 11 Cases, along with the last four digits of each debtor's federal tax identification number, are: Prime Core Technologies Inc. (5317); Prime Trust, LLC (6823); Prime IRA LLC (8436); and Prime Digital, LLC (4528) (collectively, the "Debtors" or "Prime"). The Debtors' service address is 10845 Griffith Peak Dr., #03-153, Las Vegas, Nevada 89135.

[2]  PCT Litigation Trust was established for the primary purpose of pursuing litigation and distributing assets. PCT has been vested with claims and causes of actions previously held by the Debtors.

[3]  In 2022, Electric Solidus, LLC converted from a limited liability company to a corporation under Delaware law. *See* Certificate of Conversion of Electric Solidus [*sic*] LLC, a Delaware limited liability company, converting to Electric Solidus, Inc., a Delaware corporation, dated January 3, 2022, attached as Exhibit A. Thus, Electric Solidus, LLC and Electric Solidus, Inc.—the latter of which is a named Defendant in this action—are the same entity.

to: avoid and recover all preferential and/or actual fraudulent transfers of property made by the Debtors to or for the benefit of Swan plus interest, attorneys' fees, and costs pursuant to sections 502, 544, 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and sections 1304 and 1305 of Title 6 of the Del. Code Ann. (the "Delaware Code"). *See* 11 U.S.C. §§ 502, 544, 547, 548, and 550; Tit. 6 Del. Code Ann. 1304, 1305.

To the extent that Swan has filed a proof or claim or has a claim listed by the Debtors on their schedules as undisputed, liquidated, and not contingent, or has otherwise requested payment from the Debtors or the Debtors' estate (collectively, the "Claims"), this Complaint is not intended to be, nor should it be construed as, a waiver of PCT's right to object to any such Claims for any reason, including, but not limited to, 11 U.S.C. § 502(a) through (j), and such rights are expressly reserved. PCT alleges as follows:

**INTRODUCTION**

1.      Prime was once one of the most prominent crypto companies in the United States. Thousands of other crypto companies used Prime primarily to gain access to the U.S. banking system by converting crypto to fiat. The Nevada Financial Institutions Division ("Nevada FID") shut down Prime in June 2023 and Prime filed for bankruptcy shortly thereafter in August 2023. Swan—unlike most of Prime's customers—did not suffer significant losses because Swan had insider, non-public information. Swan knew to transfer fiat and crypto from Prime immediately prior to Prime filing for bankruptcy to avoid catastrophic losses.

2.      Prime transferred $24,656,266.14 USD, 11,994.08 Bitcoin ("BTC"), 4,999,998.24 Tether ("USDT"), 9,234.91 USD Coin ("USDC"), 0.01 Ethereum ("ETH"), and 91,144 XRP to or

-2-

for the benefit of Swan (the "Transfers")[4] during the 90-day period prior to the filing of the Chapter 11 Cases.[5]

3.    During the Preference Period, Swan transferred 1.44 BTC and $2,223,693.00 USD of potential subsequent new value to Prime.[6]  Thus, Swan's preference exposure is no less than 11,992.64 BTC, 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, 91,144 XRP, and $22,432,573.14 USD (the "Preferential Transfers").[7]

4.    Prime and Swan were relatively new players in the industry when Swan first engaged Prime's services, and each grew commensurately with the other because of their lucrative symbiotic relationship.

5.    That relationship was forged not just by commercial interest but, importantly, due to Prime and Swan sharing a very significant point of contact.  One of Prime's long-serving executives ("Senior Executive") also served as a compensated outside advisor to Swan from Swan's inception through the entirety of the two companies' partnership.  Senior Executive also was neighbors with Swan's CEO, Cory Klippsten ("Mr. Klippsten").

6.    Senior Executive's position at Prime gave Swan unrivaled access to inside information about Prime's deteriorating financial condition and impending bankruptcy; information Swan used to advantageously transfer crypto and fiat from Prime immediately before Prime's bankruptcy filing.

---

[4]    *See* Declaration of James P. Brennan (the "Brennan Decl.") ¶¶ 144, 167.  The Brennan Decl. is attached hereto as Exhibit B.

[5]    Prime and certain of its affiliates filed the Chapter 11 Cases on August 14, 2023 (the "Petition Date"), meaning that Prime's preference period (the "Preference Period") occurred between May 16, 2023, and the Petition Date.

[6]    *See* Ex. B, Brennan Decl., ¶¶ 145, 168.

[7]    *See id*.

-3-

7. In July 2019, Senior Executive executed an advisor agreement (the "Advisor Agreement") with Swan. At the time, Senior Executive was a member of Prime Trust, LLC's Board of Managers. A few months later, in September 2019, before Swan had even launched as a business, Swan reached out to Prime to explore a potential partnership.

8. Swan operates a platform that provides institutional and retail customers with access to a variety of financial products and services for purchasing and investing in BTC. For example, Swan users can purchase BTC instantly and set up recurring BTC purchases.[8]

9. Swan's CEO, Mr. Klippsten, engaged Prime for liquidity purposes and to leverage Prime's money-transmitter licenses (each, an "MTL"). Specifically, Swan would transfer fiat and crypto to Prime and Prime would hold the fiat and or crypto until Swan directed Prime to transfer such fiat to or for the benefit of Swan.

10. The agreements that governed Swan and Prime's relationship during the Preference Period were: (i) the Prime Trust Order Form, executed February 18, 2022 (the "Order Form"), amended on April 19, 2022 (the "Amended Order Form"), and amended again on December 29, 2022 (the "Second Amended Order Form") (collectively, the "Governing Order Forms")[9]; (ii) the Amended and Restated API Technology Agreement Account Form, executed on October 6, 2021 (the "Amended API Agreement")[10]; and (iii) the Self-Directed Custodial Account Agreement, executed on October 23, 2019 (the "Custodial Agreement")[11] (collectively, the "Agreements").

---

[8]   *See Buy Bitcoin*, SWAN BITCOIN, https://www.swanbitcoin.com/.

[9]   The Governing Order Forms are attached hereto as Exhibit C.

[10]   The Amended API Agreement is attached hereto as Exhibit D.

[11]   The Custodial Agreement is attached hereto as Exhibit E.

11.     The Agreements establish that Swan and Prime always maintained a strictly debtor-creditor relationship.

12.     Swan did not retain Prime to establish or form any trust or fiduciary relationship. Although Prime was a Nevada state-chartered trust company, the Agreements make clear that no fiduciary relationship existed between the parties.

13.     The Governing Order Forms are governed by the Amended API Agreement and the Custodial Agreement.[12]

14.     The scope of the Amended API Agreement extended to "all services provided by Prime Trust which are accessible via the Prime Trust Application Programming Interfaces (APIs), including . . . custody[.]"[13]   The Amended API Agreement is clear in stating that: "[t]his Agreement is not intended and ***shall not be construed . . . to create any fiduciary relationship or any other obligations other than those expressly imposed by this Agreement***."[14]

15.     Under the Custodial Agreement, Prime was to "act solely as custodian of the Custodial Property."[15]   Prime also was authorized to "for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as 'street name'), with [Swan] ownership of Custodial Property segregated on its books and records."[16]

---

[12]   *See* Ex. C, Order Form, at 2.  The Order Form also stated that it was governed by the "Merchant Card Agreement between Prime Trust, LLC and Customer dated December 12, 2019" (the "Merchant Card Agreement").  *See* Ex. C, Order Form, at 2.   The Merchant Card Agreement does not contain material terms relevant to this Adversary Proceeding.  Therefore, it is neither attached to nor discussed in this Complaint.

[13]   Ex. D, Amended API Agreement (preamble).

[14]   *Id.* § 9.4 (emphasis added).

[15]   Ex. E, Custodial Agreement, § 2(a).

[16]   *Id.* § 4(b).

16.     With Prime's help, Swan's business expanded quickly and significantly.  Both companies experienced rapid growth as a result of each other's success.  Swan quickly became one of Prime's most important customers, and, because of the companies' unusually close relationship, Prime offered technology and favors to Swan that it did not offer to its other customers.

17.     For example, Prime assisted Swan with issues it faced with instantly settling BTC transactions and even offered Swan, unprompted, a $10 million loan to fund Swan's BTC settlements with its customers.

18.     Swan also demanded rapid developments in Prime's application programming interface ("API") to accommodate the volume of transactions Swan conducted through Prime.  At one point, Swan offered to fund Prime's API development expenses to expedite Prime's progress.

19.     From 2019 until 2023, Prime and Swan appeared to enjoy a lucrative business relationship.  Prime provided extensive customer support to Swan, and, in exchange, Swan generated significant revenue for Prime.

20.     However, in 2023, Prime was facing several legal and regulatory threats, and also was struggling with internal mismanagement.

21.     Prime's mismanagement of its business caused it to lose access to a digital wallet (the "98f Wallet")[17] which held approximately $80 million worth (at the time it was discovered) of ETH.  Without access to this ETH, Prime could not honor customer transfer requests and became functionally insolvent.

---

[17]     The 98f Wallet is referred to herein as such because it is a multi-sig wallet that has a digital address ending in the characters "98f".

22.    Regulatory authorities—particularly Nevada FID—learned of Prime's financial difficulties and demanded regular updates on Prime's plan to raise enough capital to replenish lost assets.  But Prime could not come up with the funds.

23.    Prime thus knew that one of its last meetings with Nevada FID on May 26, 2023, could end in its receivership.

24.    On May 22, 2023, four days before the meeting with Nevada FID, Senior Executive initiated a chat thread with Mr. Klippsten on an encrypted messaging platform and ***immediately*** set the chat to auto-delete messages after 24 hours.  That auto-delete setting was not disabled by Senior Executive until May 27, 2023—the day after the Nevada FID meeting.

25.    On May 22, 2023—the same day that Senior Executive started his encrypted chat thread with Mr. Klippsten—Senior Executive also called ▮▮▮▮▮▮ ("▮▮▮▮▮▮"), one of Prime's original founders and then-CEO of Fortress Blockchain Technologies, Inc. d/b/a Fortress Trust ("Fortress"), one of Prime's largest competitors.  During that call, Senior Executive informed ▮▮▮▮▮ of the true nature of Prime's financial issues and that Prime was facing impending receivership.

26.    On May 25, 2023, in the midst of these communications and ***one day*** before Prime's meeting with Nevada FID, Swan notified Prime that it wanted to transfer its entire business from Prime.  Swan's instruction to Prime was nothing like any of its pre-Preference Period transactions with Prime, as illustrated by the below charts:





27.      Upon learning non-public information indicating that Prime was on the cusp of bankruptcy, Swan recognized that offloading its entire business from Prime could expose it to enormous preference liability.  Swan thus undertook efforts to shield itself from such exposure.

28. On May 25, 2023, the day before Senior Executive's meeting with Nevada FID, Prime changed the label of an Internal Ledger (defined below) account designation[18] for Swan to "PT FBO Swan Customers" to facilitate the Transfers and to create the appearance that fiat and crypto held at Prime was, and always had been, held in trust for the benefit of Swan's customers. The use of the "PT FBO Swan Customers" designation provided Swan with a misleading basis to contend that the Transfers would not be subject to avoidance as preferential transfers once Prime filed for bankruptcy. In substance, however, those assets had not been and were not held in trust for the benefit of Swan's customers.

29. Later during the Chapter 11 Cases, Mr. Klippsten took to Twitter to claim—without support—that Prime could not assert preference claims against Swan and that Swan had been planning to transfer its business from Prime for nine months.

30. The Transfers exacerbated Prime's already precarious financial position, accelerating the downward financial spiral that culminated in Prime's Chapter 11 filing on the Petition Date.

31. The Transfers also gave Swan an unfair advantage over Prime's many other creditors that did not, or could not, execute similar transactions to transfer fiat or crypto from Prime during the Preference Period.

32. Because Swan and Prime's relationship was strictly a debtor-creditor relationship, PCT is entitled to avoid the funds that Swan transferred from Prime during the Preference Period.

---

[18] As described in more detail below, Prime did not maintain segregated bank accounts or digital wallets for fiat and crypto that Prime's customers transferred to Prime and, instead, merely kept note of what it owed to each of its customers on Prime's Internal Ledger (defined below). Thus, this PT FBO Swan Customers "account" was not actually an account at all—instead, it was simply a new entry on Prime's Internal Ledger.

33. Moreover, even if Swan could somehow demonstrate that the fiat and crypto that Prime transferred to or for the benefit of Swan during the Preference Period had been held in trust, Swan could not identify the fiat and crypto that Swan had transferred to Prime and prove that Prime transferred that same exact fiat and crypto to or for the benefit of Swan during the Preference Period. Prime's gross mismanagement of its business resulted in extensive commingling of fiat and crypto.

34. The fiat that Swan transferred to Prime was held in commingled "omnibus" bank accounts in Prime's own name (the "Omnibus Bank Accounts"). These omnibus bank accounts commingled fiat that Prime transferred to Prime with fiat from Prime's many other customers and with Prime's own fiat generated from its business operations. Similarly, the crypto that Swan transferred to Prime was held in commingled "omnibus" digital wallets, which also held Prime's crypto and crypto transferred to Prime by other customers (the "Omnibus Digital Wallets").

35. Prime attempted to keep track of commingled fiat and crypto transferred by Swan (and other customers) to Prime with an internal ledger (the "Internal Ledger"). But the Internal Ledger was errantly and later intentionally corrupted by Prime. Current and former Prime employees have admitted under oath that the Internal Ledger includes false information and falsified entries. Accordingly, the Internal Ledger cannot be relied on to identify or trace the fiat and crypto that Swan ultimately transferred to Prime.

36. The third-party expert retained by PCT in this matter, James P. Brennan, also has confirmed that it is practically impossible to identify or otherwise distinguish all of the fiat and

crypto that Swan transferred to Prime from the fiat and crypto transferred to Prime by Prime's other customers or from Prime's own fiat and crypto.[19]

37.     Bank account statements and blockchain data confirm that the fiat and crypto transferred from Prime to or for the benefit of Swan during the Preference Period were not the original fiat and crypto that Swan had transferred to Prime.  Rather, these Transfers were fiat from the commingled Omnibus Bank Accounts in Prime's name and crypto from Prime's commingled Omnibus Digital Wallets.

38.     Thus, the Preferential Transfers from Prime to or for the benefit of Swan during the Preference Period must be returned to the Debtors' estates pursuant to sections 547 and 550 of the Bankruptcy Code, plus interest, attorneys' fees, and costs.  In the alternative, PCT seeks to recover and avoid the Transfers as actual fraudulent transfers, plus interest, attorneys' fees and costs, pursuant to sections 544, 548, and 550 of the Bankruptcy Code, and sections 1304 and 1305 of Title 6 of the Delaware Code.

39.     During the course of this Adversary Proceeding, PCT may learn (through formal discovery or otherwise) of additional transfers made to or for the benefit of Swan that are avoidable and/or recoverable under the Bankruptcy Code.  PCT intends to avoid and/or recover all such transfers and obligations made to or for the benefit of Swan and, accordingly, reserves the right to amend this Complaint.

### **PARTIES**

40.     Plaintiff PCT Litigation Trust was created pursuant to the *Amended Joint Chapter 11 Plan of Reorganization for Prime Core Technologies Inc. and its Affiliated Debtors*

---

[19]     *See* Ex. B, Brennan Decl. ¶ 232.

(as amended, supplemented, or otherwise modified, the "Plan"),[20] which the United States Bankruptcy Court for the District of Delaware (the "Court") confirmed on December 21, 2023 in its *Findings of Fact, Conclusions of Law, and Order (I) Approving the Disclosure Statement on a Final Basis and (II) Confirming the Amended Chapter 11 Plan of Reorganization of Prime Core Technologies Inc. and its Affiliated Debtors Pursuant to Chapter 11 of the Bankruptcy Code.*[21] The Plan was consummated on January 5, 2024 (the "Effective Date").[22]  On the Effective Date, PCT Litigation Trust was established, and the Debtors' Vested Causes of Action (as defined in the Plan) were transferred and assigned to PCT Litigation Trust.[23]  PCT Litigation Trust is being administered by the PCT Litigation Trustee (as defined in the Plan), David Dunn.[24] *See id*. § 1.118.

41.  Defendant Swan was a corporation formed under the laws of Delaware. Swan maintains a primary address in Calabasas, California.

42.  In the *Second Amended Plan Supplement with Respect to Debtors' Amended Joint Chapter 11 Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (the "Plan Supplement"),[25] Prime identified preference claims against Swan as "Exempted Preference Claims", and thus, these claims were not released on the Effective Date of the Plan.[26]

---

[20]   *See* Docket No. 592-1.

[21]   *See* Docket. No. 644.

[22]   *See* Docket No. 694.

[23]   *See* Plan, § 6.21.

[24]   *See id*., § 1.118.

[25]   *See* Docket No. 539

[26]   Prime filed the Plan Supplement under seal.  *See* Docket No. 539.  Prime reserves its right to maintain the confidentiality over the remainder of the "Exempted Preference Claims" identified in the Plan Supplement.

**JURISDICTION AND VENUE**

43.     This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b) because it arises under the Bankruptcy Code and arises in and relates to cases pending under the Bankruptcy Code.  Pursuant to the Plan, this Court "retain[ed] jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including . . . to determine any . . . adversary proceeding . . . or other litigated matter pending on or commenced after the Confirmation Date, including any such . . . adversary proceeding . . . or other litigated matter brought by the Wind-Down Debtor."[27]  This Court also retained jurisdiction over all matters "to recover all assets of the Debtors and property of the Debtors' Estates, wherever located" and "to hear and determine all matters pursued by the PCT Litigation Trust."[28]  As such, this Court retained jurisdiction to preside over this Adversary Proceeding.

44.     This Adversary Proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C.  § 157(b)(2).  The Court may enter final orders in connection with the matters contained herein.

45.     In accordance with Rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware, Plaintiff confirms its consent to the entry of a final order or judgment by the Court in connection with this Adversary Proceeding to the extent that it is later determined that the Court, absent consent of the parties, cannot enter a final order or judgment in connection herewith consistent with Article III of the United States Constitution.

46.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

---

[27]    *See* Plan, § 12(c).

[28]    *Id.* §§ 12(s), (u).

47.     This Adversary Proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and sections 502, 544, 547, 558, and 550 of the Bankruptcy Code.

## BACKGROUND ON CRYPTOCURRENCY

48.     The term "cryptocurrency" refers to an asset issued and/or transferred using distributed ledger or blockchain technology, including assets sometimes referred to as "cryptocurrencies," "crypto," "virtual currencies," "digital assets," "coins," or "tokens". Cryptocurrencies are digital assets that hold value based primarily on what a purchaser is willing to pay.  BTC and ETH are currently the most popular cryptocurrencies, but there are thousands of other types of cryptocurrencies, including USDC and USDT.

49.     All cryptocurrencies exist on a "blockchain."  A blockchain is a string of code, which is the underlying technology that facilitates the creation of and subsequent transactions in a particular cryptocurrency.  All transactions are recorded on the blockchain and are publicly available.  When market participants seek to transact in a particular cryptocurrency, those transactions are submitted to the blockchain and are executed in batches of transactions, called "blocks."  Those "blocks" are publicly available and reflect all cryptocurrency transactions that occurred on the blockchain at a particular point in time.  The "blocks," in turn, are linked on the chain in chronological order—thus, a "block"-"chain."

50.     There are many different blockchains.  The first and most popular blockchain was the BTC blockchain.  Another important blockchain is the Ethereum blockchain, which made it relatively easy to create new cryptocurrencies that would reside on the Ethereum blockchain. Cryptocurrencies created on the Ethereum blockchain, including ETH, USDC, and USDT, are referred to as "ERC-20 compliant" cryptocurrencies.

51.     Users generally hold crypto in digital wallets.  On the Ethereum blockchain, crypto, digital wallets, and smart contracts are all identifiable to the public by unique "public keys."  These

public keys are 40-digit alphanumeric strings.  Anyone can use the platform Etherscan to see the complete public history of transactions associated with any of these public keys, including any time crypto is transferred or any time a smart contract is used.

52.    "Private keys" are essentially individual passwords used to denote ownership of a particular blockchain digital address.  Like public keys, private keys consist of multi-digit alphanumeric strings.  However, unlike public keys—which are identifiable to the public and used to identify a digital wallet—private keys are known only to the owner of the digital wallet and are used by that owner to access and manage the digital wallet, including any crypto kept in that wallet.

53.    Many digital wallets and private keys are "custodial," meaning they are possessed by a third party such as a centralized crypto exchange.  In contrast, "self-hosted" digital wallets do not have third parties who take possession of the wallet and crypto.

54.    Some digital wallets are "multi-sig" digital wallets, meaning that access to the digital wallet requires multiple digital "signatures."

55.    A digital wallet owner can choose to store her private key in different ways.  For example, she can write down the private key on a piece of paper or store it on a personal computer device, although both approaches are inadvisable due to the attendant risks of destruction, loss, or theft.

56.    A digital wallet owner also can use a physical hardware device to store the private key required to access the wallet, which is a more secure method.  These types of physical hardware devices are provided by companies such as Ledger and Trezor:



57.    Generally, a digital wallet owner using a physical hardware device needs to be in possession of that device to access her private keys and, thereby, access her digital wallet. However, if the wallet owner loses her physical hardware device and private keys, she may still be able to access the crypto stored on her digital wallet by transferring the ability to sign digital wallet transactions to another physical hardware device.  To do this, the wallet owner must know her digital wallet's "seed phrase"—usually twelve to twenty-four randomly generated words that, in effect, serve as a master password to access the private keys necessary to effectuate transactions in the crypto kept on the digital wallet.  Without knowledge of a digital wallet's seed phrase, gaining access to the private keys stored on a lost physical hardware digital wallet is virtually impossible, and, consequently, any crypto tied to those private keys becomes inaccessible.

58.    Smart contracts are open-sourced code that exist on the blockchain and dictate to market participants exactly how a particular transaction will be executed.  They are "self-executing," meaning that each participant to a smart contract does not have to agree in the future to make a payment or transfer crypto.  Once the "rules" of the smart contract are satisfied, the smart contract automatically executes the transaction.  Most smart contracts are designed so they can never be changed.  One example of the use of a smart contract is a "forwarder" digital wallet.

If someone sends crypto to a "forwarder" digital wallet, the underlying smart contract will automatically reroute the crypto to another predetermined digital wallet.

## **GENERAL ALLEGATIONS**[29]

### I.      **Prime's Business Operations**

59.     Prior to filing the Chapter 11 Cases, Prime was one of the crypto industry's largest market participants.

60.     Founded in 2016, Prime began as a company focused on providing custodial services for a variety of traditional financial assets.

61.     In the years that followed, as the crypto markets and industry grew substantially, Prime shifted its focus away from traditional assets and towards the crypto industry.

62.     Crypto companies in the United States traditionally have had difficulty securing banking relationships and obtaining state MTLs required to conduct money transmission.

63.     Prime attempted to solve these problems by offering what is commonly known as "money-transmission-as-a-service" for crypto companies needing traditional money transmission to facilitate their crypto business and operations.

64.     Crypto companies were able to gain access to the U.S. banking system through Prime's banking relationships, thus avoiding having to expend the time, effort, and financial resources necessary to obtain their own MTLs.

65.     Crypto companies also were able to conduct money transmission through Prime by leveraging Prime's regulatory status as a Nevada state-chartered trust company, which exempted Prime from acquiring MTLs in many states that required them.

---

[29]    Prime has redacted certain information categorized as "Confidential" and "Highly Confidential – Professionals' Eyes Only" in this Complaint pursuant to the *Stipulated Protective Order* approved by the Court in the Chapter 11 Cases [Docket No. 323].

**II.     Senior Executive Worked in Senior Positions at Prime While Simultaneously Serving as a Paid Advisor to Swan**

66.     Senior Executive joined Prime in 2017 and served in various senior positions throughout Prime's history.

67.     For most of his time working for Prime, Senior Executive also served as a paid advisor to Swan.

68.     On July 11, 2019—just a few months before Swan entered into its first customer agreement with Prime—Senior Executive executed the Advisor Agreement with Swan. Mr. Klippsten executed the Advisor Agreement on behalf of Swan.

69.     Under the Advisor Agreement, Senior Executive was to advise Swan with respect to corporate, research, product development, and marketing activities.  Senior Executive also was asked "███████████████████████████████████████████████

█████████████████████████████████████████████████"



70.     ████████████████████████████████████████████████

████████████████████████████████████████████████████.



71.    Senior Executive represented that "███████████████████
████████████████████████████████████████████████████████
██ "

72.    ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████[30]

## III.    Prime and Swan's Relationship

### A.    Swan Engaged Prime's Services

73.    In September 2019, only a few months after Swan retained Senior Executive as a paid advisor, Swan reached out to Prime to explore a potential partnership.

74.    At the time Swan had not yet launched its business.  Swan was known then as "GiveBitcoin."[31]

---

[30]    *See* ████████████████████, attached hereto as <u>Exhibit F</u>.

[31]    *See* CRYPTO TOKEN TALK, *GiveBitcoin with Cory Klippsten*, APPLE PODCASTS (May 12, 2019), https://podcasts.apple.com/ie/podcast/givebitcoin-with-cory-klippsten/id1342460763?i=1000458761314.

75.     Swan's business has since grown to provide institutional and retail customers with access to a variety of financial products and services for purchasing and investing in BTC.  For example, Swan users can now purchase BTC instantly, set up recurring BTC purchases, and invest in BTC IRA accounts.[32]

76.     Swan engaged Prime in significant part for its money transmitter services and the fact that Prime could facilitate transactions automatically through its API.  Generally speaking, an API is a set of rules and specifications that enable two separate applications to communicate with each other.

77.     Prime also offered compliance services relating to "anti-money laundering" ("AML") and "know-your-client" ("KYC") laws and regulations.  These services enabled the gathering of biographical and financial information required to facilitate fiat and crypto transactions in accordance with applicable regulatory requirements.

**B.      The Parties' Agreements Created a Debtor-Creditor Relationship Between Prime and Swan**

78.     At all relevant times, the Agreements were valid and enforceable contracts governed by Nevada law.[33]

79.     On February 18, 2022, Prime and Swan executed the Order Form with an order start date of March 1, 2022, which specified the services Prime provided to Swan and the costs for each of those services.[34]  This Order Form also specified that Prime would provide services to

---

[32]   *See Buy Bitcoin*, SWAN BITCOIN, https://www.swanbitcoin.com/.

[33]   *See* Ex. E, Custodial Agreement, § 18 ("This Agreement is governed by and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws."); Ex. D, Amended API Agreement, § 9.11 ("This Agreement is governed by, and will be interpreted and enforced in accordance with the laws of the State of Nevada without regard to principles of conflict of laws.").

[34]   *See* Ex. C, Order Form.

Swan, including API services and custodial services, ACH services, KYC services, and IRA services.[35]

80.     The Order Form was amended on April 19, 2022 by the Amended Order Form, to add provisions for IRA account services.[36]

81.     The Amended Order Form was amended by the Second Amended Order Form to cover the time period from December 31, 2022 to December 31, 2023.[37] Substantively, the Second Amended Order Form primarily altered the fee schedule for the various services Prime provided to Swan.

82.     The Second Amended Order Form specified that it "is incorporated into and forms part of the Prime Trust Order Form with Order Start Date of 3/1/2022 ('Original Order Form') as amended by the First Amendment to the Order Form executed on 4/19/2022 ('Amendment 1')."[38] The Second Amended Order Form provided that "[e]xcept as set forth in this [Second Amended Order Form], all of the terms of the . . . Order Form and [the Amended Order Form] remain in full force and in effect with no further changes."[39]

83.     The Second Amended Order Form also included "Order Special Terms." Those Order Special Terms were that "[b]oth Parties agree to continue working in good faith to complete negotiations for a new Prime Trust Master Services Agreement to replace the existing agreement

---

[35]   *See id.*, 1–2.

[36]   *See* Ex. C, Amended Order Form. IRA account services are not relevant to the Transfers alleged in this Complaint.

[37]   *See* Ex. C, Second Amended Order Form, 1–3.

[38]   *See id.* at 2.

[39]   *See id.*

between the Parties and an interest offering for Assets Under Custody on or before March 31, 2023."[40]

84.    Upon information and belief, the parties neither completed negotiations for nor executed "a new Prime Trust Master Services Agreement" before the Petition Date.

85.    Prime and Swan executed an API Agreement on October 8, 2019 (the "Original API Agreement").[41]

86.    The Original API Agreement provided that "[t]his Agreement is not intended and ***shall not be construed . . . to create any fiduciary relationship or any other obligations other than those expressly imposed by this Agreement***."[42]

87.    Swan and Prime executed amendments to the Original API Agreement on: (i) on January 31, 2020 (the "First API Agreement Amendment"), (ii) July 17, 2020 (the "Second API Agreement Amendment"), and (iii) November 13, 2020 (the "Third API Agreement Amendment")—each of which "incorporate[d] by reference, confirm[ed], and ratif[ied] the [API] Agreement," including the disclaimer of any fiduciary duty.[43]

88.    On October 1, 2021, Swan and Prime executed a new Amended API Agreement that "amend[ed] and restat[ed], in its entirety, and replac[ed]" the API Agreement (and subsequent

---

[40]    *See id.*

[41]    The Original API Agreement (and its amendments) is attached hereto as Exhibit G.

[42]    Ex. G, Original API Agreement, § 9.4 (emphasis added).

[43]    The First API Agreement Amendment included amendments to the fees charged in connection with outgoing transfers.  The Second API Agreement Amendment included additional liquidity access services, internal process modifications, and amendments to the fees Prime charged Swan for its services. The Third API Agreement Amendment restated certain fees Prime charged for its services.  The First, Second, and Third API Agreement Amendments are included in Exhibit G.

amendments).[44] This Amended API Agreement governed the parties' relationship during the Preference Period.

89. The scope of the Amended API Agreement extended to "all services provided by Prime Trust which are accessible via the Prime Trust Application Programming Interfaces (APIs), including . . . custody[.]"[45]

90. The Amended API Agreement provides that, "[t]his Agreement is not intended and *shall not be construed . . . to create any fiduciary relationship or any other obligations other than those expressly imposed by this Agreement*."[46]

91. The Second Amended Order Form also specified that it was governed by the Custodial Agreement, which provided that Swan "appoint[ed] Prime Trust to be custodian and to hold or process as directed all securities, cash, and other assets of [Swan] . . . that are delivered to and accepted by [Prime]."[47]

92. Under the Custodial Agreement, Prime was to "act solely as custodian of the Custodial Property."[48] Moreover, Prime was authorized to "for convenience take and hold title to Custodial Property or any part thereof in its own name or in the name of its nominee (commonly known as 'street name'), with [Swan] ownership of Custodial Property segregated on its books and records."[49]

---

[44]   *See* <u>Ex. D</u>, Amended API Agreement.

[45]   *Id.* (preamble).

[46]   *Id.*, § 9.4 (emphasis added).

[47]   <u>Ex. E</u>, Custodial Agreement, § 1.

[48]   *Id.* § 2(a).

[49]   *Id.* § 4(b).

93.    Finally, the Custodial Agreement authorized Prime to "hold the proceeds" derived from the maturity, redemption, or sale of the fiat and crypto Swan transferred to Prime.[50]

94.    There is no language in the Custodial Agreement indicating that Prime owed any fiduciary duty to Swan or its customers.

95.    The Custodial Agreement also lacks any terms that would suggest that Prime held fiat or crypto in trust on behalf of Swan or any of its customers.

96.    Thus, the Agreements established that the parties always maintained a debtor-creditor relationship.

C.    **Prime and Swan Had an Unusually Close Relationship from the Beginning**

97.    Swan became an important customer to Prime almost immediately.  Within a month of executing agreements with Prime, Swan's platform went live and Swan started to onboard a significant number of Swan customers to Prime.  With Prime's help, Swan and its offerings dramatically expanded to the benefit of both Swan and Prime.

98.    At the start of Prime and Swan's relationship, Prime's API was not yet sophisticated enough to automatically clear transactions and conduct KYC/AML checks on new customers.

99.    In communications with Swan, Prime estimated that its API would be able to do so by the end of 2019.  For a few months between October and December 2019, Prime thus handled transactions manually.

100.    Although Prime had found a way to conduct processes manually, Swan was concerned that the process would be too slow for the thousands of customers Swan expected to sign up with Prime.

---

[50]    *Id.* § 4(d).

101.    Indeed, Swan's need for automation was so great that Swan co-founder and Chief Technology Officer, Yan Pritzker ("Mr. Pritzker"), engaged Senior Executive to intervene with Prime on Swan's behalf to stress the importance of Prime's API technology development for Swan.

102.    Mr. Pritzker proposed several potential solutions to Senior Executive, including ways to make the process less manual and more automatic.   Senior Executive passed these suggestions on to ██████████, Prime's Chief Compliance Officer.

On Sat, Dec 19, 2020 at 07:46 ███████████████@primetrust.com> wrote:
██,

We have been prioritizing to get off spreadsheets and are developing system capabilities to address. Believe the timing is about a month—looping in ███ to confirm. We should see the review times come down as the backlog has been getting cleared.

████████████

Chief Compliance Officer

+1.702.291.7139 | Schedule Meetings: https://calendly.com,██████████ | 330 S. Rampart, Suite 260, Summerlin, NV 89145

On Fri, Dec 18 2020 at 10:35 PM, █████████████████████> wrote:
I've used Swan/GiveBitcoin a few times and found that many of my friends end up trapped, so I reached out to Swan to figure out what was going on.  Currently, my friend ██████████ is trapped in Prime Trust aml/kyc for example so she should've gotten bitcoin at around 18k but it's already 23k now.

In trying to sort out what happened, I learned that Prime Trust was essentially sending a spreadsheet of exceptions to Swan.  Isn't that a much more manual process than it needs to be?  Now, I don't care much if Swan has to put human labor to it, but if it's causing PT to be slow/delayed, etc., would automating this process be better?  My friends have sometimes been trapped for weeks, or even over a month.

I asked Yan at Swan to explain to me what was going on and what suggestions they might have to improve the process b/c I wanted to check with Compliance to see if there was a more streamlined method to deal with this.

103.   Notably, in the email, Senior Executive disclosed that he was an advisor to Swan, that he was pursuing these solutions on Swan's behalf, and that he lived four doors down from Swan founder Mr. Klippsten.

> ██████, as disclosure, I'm an advisor to Swan (the founder lives 4 doors down from me), but we should take the position that is most beneficial for Prime Trust. While I certainly want to make the process easier for clients in general, I primarily want to make sure the workload for us is manageable. It seems to me that if we are taking weeks to approve some of their stuff, then somehow we are probably using a less than optimal process.
>
> Regards,
>
> ██████

104.   Eventually, Prime's API developed to the point that it could automate these processes more efficiently. But as it did so, and as Swan's business grew, Swan's needs became more complex. Swan consequently approached Prime with requests to further develop Prime's API technology to tailor it to Swan's requirements.

105.   Prime rushed to help Swan handle its issues. In fact, Prime was so solicitous of Swan's needs, that its most senior executives sometimes made promises without knowing if they could be kept and executed transactions that benefited Swan but subjected Prime to potential legal trouble.

106.   For example, in February 2021, apparently noticing that Swan was running out of its ACH reserves for instant settlements, ██████ sent Mr. Klippsten an unprompted email offering to loan Swan up to $25 million to fund Swan's ACH reserves at a steep discount.

107.   However, somehow unbeknownst to ██████, Prime did not in fact have sufficient funds to wire $10 million to Swan. In fact, Prime only had about $1.5 million in its capital clearing account at the time.

108.    Lacking sufficient funds in its capital clearing account, Prime resorted to tapping other accounts, including those containing funds transferred to Prime by its other customers, to make the $10 million loan to Swan.[51]

109.    Thus, Swan was such an important client that Prime executives were willing to perform favors for Swan despite the obvious legal and regulatory risks.

110.    During this same time, Swan's need for Prime to develop its API technology to handle delayed settlement became so great that Swan offered to pay Prime to support that technological development.

111.    Prime's tailoring of technological improvements for Swan seemed to pay off. Swan's business earned Prime millions of dollars a year and, by 2022, was projected to account for approximately 8% of Prime's total revenue.

112.    As Swan and Prime worked hand-in-hand to support development of Prime's technology and growth of Swan's business, the two companies began to closely associate with each other in their public facing marketing and advertising materials.

113.    For example, Swan lauded Prime's "turnkey API-based liquidity engine" in a press release announcing the launch of the product. Marketing such as this mutually reinforced Swan's ability to meet its customers' needs and Prime's rapid technological development.

---

[51]    As explained in the Brennan Declaration, the various account numbers associated with Prime customer names on the Internal Ledger did not actually correspond with unique, segregated bank accounts. *See* Ex. B, Brennan Decl., ¶ 128, n.31.

Prime Trust Adds Bitcoin Liquidity to the B2B PrimeCore Platform Enabling Fintech Innovators to Provide Digital Asset Investing, Buying and Selling

Swan Bitcoin adopts Prime Trust's turnkey API based liquidity for crypto into their investing platform

"We are thrilled to collaborate with Prime Trust in this venture and have seen real value in using their new service," said Cory Klippsten, CEO of Swan Bitcoin. "The Prime Trust solution is turnkey and simple to integrate into our applications. Prime Liquidity offers our users the security and liquidity they need for an impactful trading experience so we can focus on other important aspects of our business."

114.    In sum, Prime and Swan cooperated to establish a lucrative and increasingly symbiotic business relationship, to which Senior Executive was critical.

## IV.    The 98f Wallet

115.    In December 2021, other "flagship" customers of Prime, Plutus Financial Inc. d/b/a Abra and Plutus Lending LLC (collectively, "Abra"), requested a transfer of 5,867.71 ETH (worth approximately $24,000,000 at the time) from Prime.[52] Abra followed-up on its initial request with additional requests for ETH transfers, ultimately requesting a total of 48,034.57 ETH (worth approximately $145,000,000 at the time) between December 2021 and March 2022.[53]

116.    In attempting to satisfy Abra's transfer requests, Prime discovered "a large discrepancy between [Prime's] ledger" and the amount of ETH that Prime held in its digital wallets:

---

[52]    *See* Ex. B, Brennan Decl. ¶¶ 118–119.

[53]    *See id.* ¶ 123.

[redacted]@primetrust.com                                    2021-12-22 07:16:57.000 PM

Hey ** - Expanding this to a larger audience as this has become a priority issue that was brought up earlier today: We have uncovered a large balance discrepancy between our ledger and Fireblocks where we are showing a larger amount of ETH (~9000) than what is shown in Fireblocks. This was a result of a larger disbursement requested by Abra which requires us to aggregate ETH; upon running a balance check on our incoming wallet address, we noticed the amount was not enough to send out the request. We are double checking to confirm that this is not a result of double spend(s) but from our first pass, it appears to not be a result of manually sending ETH transactions incorrectly. I know @[redacted] and @[redacted] [redacted] are investigating but not sure what are the other possibilities could result in this difference that we see. It may also be worth it to ask FB of an audit of their side if we can confirm nothing is incorrectly processed on our side.

117.    Further investigation revealed that, for approximately eight months, Prime had been permitting Abra to transfer significant amounts of ETH to a multi-sig digital wallet that Prime was no longer able to access—the 98f Wallet.

118.    Specifically, in December 2021, Prime discovered that Abra had already transferred more than 11,000 ETH (worth approximately $45,000,000 at the time) to the 98f Wallet.[54]

119.    In or around December 2021, Prime discovered that nobody at Prime had any knowledge about how to access the 98f Wallet.[55]

120.    It was unclear to those at Prime who the signers for the 98f Wallet were or how Prime could access the 98f Wallet.[56]  Prime did not possess and could not locate the hardware devices which stored the private keys necessary to access the 98f Wallet.[57]  Prime also did not possess and could not locate the seed phrases that were associated with these physical hardware devices.[58]

---

[54]    *See id.* ¶ 120.

[55]    *See id.* ¶ 119.

[56]    *See* Deposition of [redacted], *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Mar. 29, 2024) (the "[redacted] Dep."), 69:17–71:22.

[57]    *See id.*, 181:6–8.

[58]    *See id.*

121.    Because Prime had no way of obtaining the private keys necessary to access the 98f Wallet, Prime had no way to access it.  The crypto stored therein was effectively lost to Prime, leaving a significant hole in Prime's finances.

122.    Prime was concerned about the negative consequences it would suffer from customers, regulators, law enforcement, auditors, and others if Prime were to publicly reveal that it had lost access to a wallet containing a significant amount of crypto.

123.    To avoid publicly revealing that it was unable to access the 98f Wallet, certain executives at Prime made the decision to use fiat from Prime's commingled, Omnibus Bank Accounts to purchase ETH from one of its liquidity providers ("Liquidity Provider") that could then be used to satisfy Abra's transfer requests.[59]

124.    Between December 23, 2021, and March 30, 2022, Prime conducted ten different on-chain purchases of ETH from Liquidity Provider in an attempt to satisfy Abra's multiple outgoing transfer requests.  These purchases are summarized in the chart below.[60]

| Date | ETH On-Chain Transfers |
|---|---|
| 12/23/2021 | 2,999.99 |
| 12/31/2021 | 3,250.00 |
| 1/6/2022 | 800.00 |
| 1/6/2022 | 2,100.00 |
| 1/21/2022 | 1,930.50 |
| 3/11/2022 | 1,800.00 |
| 3/14/2022 | 3,049.98 |
| 3/15/2022 | 3,000.00 |
| 3/29/2022 | 2,300.00 |
| 3/30/2022 | 2,347.22 |

---

[59]    *See* Ex. B, Brennan Decl., ¶¶ 121–136

[60]    *See id*. ¶ 123.

125.   The funds for each of these ETH purchases came from Prime's Omnibus Bank Accounts, which held commingled fiat transferred to Prime by its customers.[61]   The ETH purchased with those commingled funds was then transferred to Abra.[62]



126.   The decision to use this commingled fiat to fund Prime's purchase of replacement ETH from Liquidity Provider was described by ▮▮▮▮▮, Prime's former Chief Operating Officer, at his deposition:

> Q:   So Abra's depositing into a wallet that you don't have access to and is requesting withdrawals.  Prime funds those withdrawals.  How does it do it?
>
> A:   I would defer to ▮▮▮ on that.  But essentially it was use of omnibus funds, is my understanding.
>
> Q:   What's use of omnibus funds?
>
> A:   As I mentioned before, my understanding is we maintained omnibus accounts, meaning fiat accounts and crypto accounts, crypto wallets that had basically commingling of customer funds.

---

[61]   *See id.* ¶ 124.

[62]   *See id.* ¶¶ 125–126.

Q:      And which funds were used to make the purchases of the ETH to fund the transactions?

A:      Funds from the fiat account.  Fiat omnibus account.  Is my understanding. Once again, ███ would know specifically.[63]

127.    The ETH that Abra had initially transferred to Prime was (and still is to this day) locked away in the 98f Wallet.[64]

128.    Executives at Prime made the decision to falsify entries in the Internal Ledger to conceal the fact that Prime had used fiat transferred to it by other customers to satisfy Abra's outgoing transfer requests.[65]

129.    ███████ ("██████"), Prime's former SVP of Operations and Reconciliations, confirmed in his deposition that Prime executives intentionally chose to settle and record Prime's ETH purchases from Liquidity Provider on Prime's Internal Ledger as opposed to externally transferring funds to the Liquidity Provider.[66]

130.    These actions taken by Prime executives resulted in a discrepancy between the amount of fiat reflected on Prime's Internal Ledger and the amount of fiat Prime actually held in its Omnibus Bank Accounts.[67]

---

[63]   Deposition of ██████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 92:25–93:18.

[64]   *See* Ex. B, Brennan Decl., ¶ 126.

[65]   *See id.* ¶¶ 127–136.

[66]   *See* ███ Dep., 19:23–20:13.

[67]   *See id.*



131.        ▌ further testified about Prime's "inflat[ed]" Internal Ledger compared to the fiat in Prime's Omnibus Bank Accounts:

Q:    [T]here's going to be cash reflected in [Liquidity Provider]'s account, but that cash is not actually in the bank; is that right?

A:    Correct.  Correct.

Q:    And the cash that [Liquidity Provider] would have had, if they were to withdraw, that's just in the omnibus cash account, that has everybody else's—all other customers' cash in it, too; right?

A:    Correct . . .

Q:    I see.  But the [l]edger would show an amount owed to your customers that's higher than the amount that you're holding in your bank?

A:    Exactly.

Q:    That's ultimately what happened; right?

A:    Yeah, that's exactly what happened.[68]

132.    Desperate to cover the hole in its balance sheet, certain Prime executives discussed how to hide these transactions from auditors at Nevada FID:

---

[68]    ▌ Dep., 144:11–20, 146:7–15.



133.    As demonstrated by the illustrative chart below,[69] Prime's Internal Ledger falsely displayed "incoming" wire transfers for Liquidity Provider equivalent to the amounts of fiat that Prime credited to Liquidity Provider to fund the ETH Purchases between December 23, 2021, and March 30, 2022:

| created_date | cash_transaction_id | name | funds_transfer_type | amount |
|---|---|---|---|---|
| 12/23/2021 | ~0457 | Liquidity Provider | wire | 11,958,000.00 |
| 12/31/2021 | ~0902 | Liquidity Provider | wire | 12,158,250.00 |
| 1/6/2022 | ~b83d | Liquidity Provider | wire | 2,778,400.00 |
| 1/6/2022 | ~5aaa | Liquidity Provider | wire | 7,293,300.00 |
| 1/22/2022 | ~6c81 | Liquidity Provider | wire | 5,000,000.00 |
| 3/12/2022 | ~777d | Liquidity Provider | wire | 4,644,000.00 |
| 3/15/2022 | ~2910 | Liquidity Provider | wire | 8,043,000.00 |
| 3/15/2022 | ~1b2e | Liquidity Provider | wire | 8,524,750.00 |
| 3/29/2022 | ~113f | Liquidity Provider | wire | 7,902,800.00 |
| 3/30/2022 | ~ecc3 | Liquidity Provider | wire | 8,065,047.90 |
| | | | **Total** | **76,367,547.90** |

---

[69]    See Ex. B, Brennan Decl., ¶ 132.  This illustrative chart is not an image directly copied from Prime's Internal Ledger.  Rather, this chart contains data from Prime's Internal Ledger related to certain transaction entries.

134.    None of these wire transfers appear on Prime's bank account statements because they did not actually occur.[70]

135.    As described below, Prime's recordkeeping procedures were in disarray before Prime began intentionally falsifying entries in its Internal Ledger to conceal its use of commingled fiat to purchase replacement ETH.  The decisions of Prime executives to intentionally obfuscate Prime's internal records simply compounded the already impossible task of untangling or segregating fiat or crypto transferred to Prime by different customers and fiat or crypto that Prime generated from its business operations.[71]

## V.    Swan Learned Non-Public Information About Prime's Worsening Regulatory and Insolvency Crises Immediately Prior to Transferring All Fiat and Crypto From Prime

### A.    The 98f Wallet Issue Posed an Existential Threat to Prime's Business, Leading Prime to Report the Issue to Regulators

136.    Prime's financial condition worsened over time as it was ultimately unsuccessful in its attempts to regain access to the 98f Wallet.

137.    In August 2022, the executives at Prime who knew of the issue with the 98f Wallet reported the issue to Prime's board of directors.

138.    Between September and November 2022, Prime informed Nevada FID about the 98f Wallet issue.

139.    Because of the 98f Wallet problem, Prime was effectively insolvent and could not honor customer transfer requests.

---

[70]    *See id.* ¶¶ 133–135.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 23, 2021, is attached as Exhibit H.  The relevant portion of Prime's Signature bank account statement for the month of December 2021 reflecting incoming transactions on December 31, 2021, is attached as Exhibit I.

[71]    *See id.*, ¶ 136.

140.    In the weeks leading up to the Petition Date, it became apparent to regulators that Prime was having significant liquidity issues.  Prime personnel had multiple meetings with Nevada FID during this time to discuss how to handle the solvency issues Prime was facing, including one meeting on May 26, 2023.

141.    Prime's efforts to remedy its solvency problems were not successful.  Prime had not raised sufficient capital and had not been able to find a serious buyer prior to the May 26, 2023 Nevada FID meeting.

142.    Prime knew going into the May 26, 2023 Nevada FID meeting that it was facing an existential threat.

**B.      In the Midst of Prime's Financial Difficulties and Impending Bankruptcy, Senior Executive Covertly Contacted Mr. Klippsten**

143.    Senior Executive was close personal friends with Mr. Klippsten, Swan's CEO. Senior Executive was employed by Swan through Mr. Klippsten, and Mr. Klippsten lived only "four doors down" from Senior Executive.

144.    On May 22, 2023, just days before Prime's May 26, 2023 Nevada FID meeting, Mr. Klippsten and Senior Executive began a private chat on an encrypted messaging platform.

145.    The messaging platform had a feature that allowed users to auto-delete their messages every 24 hours.

146.    On May 22, 2023, Senior Executive began the encrypted chat by messaging Mr. Klippsten, "Hey this is [Senior Executive]'s [Prime Trust] account."  Senior Executive then *immediately* enabled his messages to auto-delete every 24 hours.

147.    The next notification still available between Senior Executive and Mr. Klippsten was from May 27, 2023, *the day after the Nevada FID meeting and the same day Swan transferred 10,080.1085 BTC from Prime*.  That notification shows that Senior Executive turned off the auto-delete feature.



148.    Swan knew that Prime did not hold fiat or crypto in trust and failed to segregate fiat or crypto transferred to Prime by its customers.  Therefore, Swan knew that the fiat and crypto Prime transferred to or for the benefit of Swan in the days leading up to the bankruptcy would not be shielded from avoidance in a potential bankruptcy.

149.    Despite this knowledge, the day after Prime was placed under receivership by Nevada FID on June 26, 2023, Mr. Klippsten, in a series of public tweets, attempted to persuade his followers that the fiat and crypto that Prime transferred to or for the benefit of Swan prior to the receivership would not be subject to avoidance in the event Prime filed for bankruptcy.

150.    Without citing any support, Mr. Klippsten publicly asserted that Prime's status as a trust company, standing alone, should preclude it from clawing back fiat and crypto transfers

made to its customers or else "the government would have to get rid of all trust companies and a century of trust structure legal precedent."



151.    A particularly astute observer noted that the BTC that Swan had transferred to Prime must have been "moved out of harm[']s way by sheer luck" if it was in fact true that Swan was "unaware of an $80 million insolvency with their custody partner's [Prime's] balance sheet." Mr. Klippsten responded with a fictitious story that Swan had no special knowledge of Prime's issues and that Swan had been planning to move its business from Prime for nine months.



152.    But, as explained more fully below, Swan had not intended to transfer all fiat and crypto from Prime nor move its business from Prime ***until the day before the May 26, 2023 Nevada FID meeting***.

153.    While Swan was indeed in the process of offboarding its Connecticut and Texas customers from Prime due to those states suspending or threatening to suspend Prime's MTLs, it was not until May 25, 2023, three days after Senior Executive set his messages to auto-delete and privately messaged Mr. Klippsten and (as discussed below) called ███████ at Fortress, that Swan decided to transfer ***all*** fiat and crypto from Prime.

C.      ███████████ at Fortress and Others in the Crypto Industry Learned About Prime's Impending Financial Difficulties

154.    As early as March 2023, ███████[72] and Senior Executive had been in contact about the possibility of Fortress acquiring Prime's assets to attempt to salvage some value out of Prime.

155.    However, ███████ communicated to Senior Executive his concern about the risk such a potential acquisition would entail, suggesting that ███████ was aware of Prime's financial difficulties as early as March 2023.

156.    On May 22, 2023—*the same day* that Senior Executive started his private chat on an encrypted messaging platform with Swan's CEO, Mr. Klippsten—Senior Executive called ███████.

157.    Following this call, ███████, and others at Fortress, became specifically aware that Prime had a shortfall in assets in the tens of millions of dollars and that Prime was likely to be placed under receivership in the near future.

158.    Additionally, Fortress personnel had access to Prime's deal room prior to a May 23, 2023 call with Fortress, Prime, and Prime's key stakeholders.  This access led Fortress to learn further details about Prime's financial issues and the 98f Wallet problem.

159.    Fortress ultimately made an offer to Prime which Prime rejected.

---

[72]    ███████ was one of the original founders and executives of Prime before he founded Fortress.  Fortress was a direct competitor of Prime.

VI.     **The Transfers**

A.      **Swan Suddenly Pivoted Its Strategy from Offloading Only Crypto and Fiat Associated with Certain States to Urgently Offloading All Crypto and Fiat from Prime**

160.    By May 2023, Swan was already working closely with Prime to transfer fiat and crypto from Prime's platform related to Swan customers located in Connecticut, Texas, and potentially other states that, at that time, had already taken or were threatening to take regulatory action against Prime.

161.    However, at this point, Swan's intention to transfer fiat and crypto from Prime was limited to *just those states*.

162.    This changed on Thursday, May 25, 2023—the day before Senior Executive and others met with Nevada FID.

163.    On May 25, 2023, for the first time, Swan notified Prime that it was transferring *all* fiat and crypto from Prime.

164.    This notification came three days after Senior Executive created the private chat with Mr. Klippsten; three days after Senior Executive called ▮▮▮▮▮▮ at Fortress; and *one day before Prime's meeting with Nevada FID*.

165.    On May 26, 2023, ▮▮▮▮▮▮▮▮ ("▮▮▮▮▮▮"), Swan's account manager at Prime, alerted her team that "[t]he plan for moving funds *has now expanded from closed states to all [Swan] accounts held here at Prime Trust*."

166.    ▮▮▮▮▮▮ specifically noted that Prime was to "attempt to complete [the migration] *before COB today*." Upon information and belief, the urgency for Prime to transfer all fiat and crypto to or for the benefit of Swan was at Swan's insistence.



**Re: Swan - Migration of Funds in Closed States**

| | |
|---|---|
| **Sent:** | Fri 5/26/2023 5:58:12 PM (UTC+01:00) |
| **From:** | ▮▮▮▮▮ |
| **To:** | ▮▮▮▮▮ |
| **CC:** | ▮▮▮▮▮ |

Hi All,

The plan for moving funds has now expanded from closed states to all accounts held here at Prime Trust, with the attempt to complete before COB today. Thank you all for your continued help.

167.    In a Slack group chat between Prime and Swan employees, ▮▮▮▮▮ at Prime asked how much Swan was planning on wiring out from Prime. Sheetal Ray ("Ms. Ray"), Swan's Chief Operating Officer, responded that the transfer would be Swan's ***entire USD balance***. Ms. Ray also said that Mr. Klippsten told "▮▮▮ about this last night"—*i.e.*, May 25, 2023—and that Swan needed to "transfer all assets" from Prime's platform.

168.    Mr. Pritzker confirmed that Swan needed to transfer all fiat and crypto: "anything we have on file basically":



▮▮▮▮▮@primetrust.com"@Slack> To ▮▮▮▮▮
<▮▮▮@primetrust.com"@Slack>, ▮▮▮@primetrust.com▮▮▮@primetrust.com"@Slack>,
▮▮▮▮▮@primetrust.com"@Slack>, "Cory Klippsten"
<"cory@swanbitcoin.com"@Slack>, "Brendan Lane" <"brendan@swanbitcoin.com"@Slack>, ▮▮▮
▮▮▮▮▮@primetrust.com"@Slack>, "Yan Pritzker" <"yan@swanbitcoin.com"@Slack>, ▮▮▮
▮▮▮▮▮@primetrust.com"@Slack>, "Jeremy Showalter"
<"jeremy@swanbitcoin.com"@Slack>, ▮▮▮▮▮@primetrust.com"@Slack>,
▮▮▮▮▮@primetrust.com"@Slack>, "Gui Gomes"
<"gui@swanbitcoin.com"@Slack>, "Saj Akhtar" <"saj@swanbitcoin.com"@Slack>, "Sheetal Ray"
<"sheetal@swanbitcoin.com"@Slack>, "Bill " <"bill@swanbitcoin.com"@Slack>

How much are you planning on wiring out? We would wire from BMO. @Yan (UTC-6)

*May 26, 2023 9:03 AM (Eastern)*

```
"Sheetal Ray" <"sheetal@swanbitcoin.com"@Slack> To [REDACTED]
<[REDACTED]@primetrust.com"@Slack>, [REDACTED]@primetrust.com" <[REDACTED]@primetrust.com"@Slack>,
'[REDACTED]@primetrust.com"@Slack>, "Cory Klippsten"
<"cory@swanbitcoin.com"@Slack>, [REDACTED]@primetrust.com"@Slack>,
"Brendan Lane" <"brendan@swanbitcoin.com"@Slack>, [REDACTED]
<[REDACTED]@primetrust.com"@Slack>, "Yan Pritzker" <"yan@swanbitcoin.com"@Slack>, [REDACTED]
[REDACTED]@primetrust.com"@Slack>, "Jeremy Showalter"
<"jeremy@swanbitcoin.com"@Slack>, [REDACTED]@primetrust.com"@Slack>,
[REDACTED]@primetrust.com"@Slack>, "Gui Gomes"
<"gui@swanbitcoin.com"@Slack>, "Saj Akhtar" <"saj@swanbitcoin.com"@Slack>, "Bill "
<"bill@swanbitcoin.com"@Slack>

    Our entire USD balance - Cory talked to [REDACTED] about this last night.  We need to transfer all
    assets.

May 26, 2023 9:04 AM (Eastern)
```

```
"Yan Pritzker" <"yan@swanbitcoin.com"@Slack> To "[REDACTED]
<[REDACTED]@primetrust.com"@Slack>, [REDACTED]@primetrust.com"
<[REDACTED]@primetrust.com"@Slack>, [REDACTED]@primetrust.com"@Slack>,
"Cory Klippsten" <"cory@swanbitcoin.com"@Slack>, [REDACTED]
<[REDACTED]@primetrust.com"@Slack>, "Brendan Lane"
<"brendan@swanbitcoin.com"@Slack>, [REDACTED]
<[REDACTED]@primetrust.com"@Slack>, '[REDACTED]
<[REDACTED]@primetrust.com"@Slack>, "Jeremy Showalter"
<"jeremy@swanbitcoin.com"@Slack>, [REDACTED]
<[REDACTED]@primetrust.com"@Slack>, [REDACTED]
<[REDACTED]@primetrust.com"@Slack>, "Gui Gomes"
<"gui@swanbitcoin.com"@Slack>, "Saj Akhtar" <"saj@swanbitcoin.com"@Slack>,
"Sheetal Ray" <"sheetal@swanbitcoin.com"@Slack>, "Bill "
<"bill@swanbitcoin.com"@Slack>

    not just BTC, also ETH USDT, USDC. anything we have on file basically

May 26, 2023 9:21 AM (Eastern)
```

**B.    Prime Created the "PT FBO Swan Customers" Internal Ledger Account Designation to Give the False Appearance That Prime Always Held Fiat and Crypto for Swan and Its Customers in Trust Despite Both Prime and Swan Knowing Prime Did Not**

169.    The transfer process of offloading all crypto and fiat from Prime was not simple.

Swan had thousands of "internal accounts" designated on Prime's Internal Ledger.[73]

---

[73]    As explained more fully herein, these "internal accounts" did not correlate with actual bank accounts or digital wallets since Prime did not actually segregate bank accounts and digital wallets by customer.  Rather, fiat was commingled in Omnibus Bank Accounts in Prime's name at large banking institutions and crypto was commingled in Prime Omnibus Digital Wallets.  *See* Ex. B, Brennan Decl. ¶¶ 28, 93.  Prime attempted to track the fiat and crypto each customer had transferred to Prime on its Internal Ledger using "internal account" references.  *See id.* ¶¶ 34–35.

170. The transfer process also required ascertaining the amount of fiat and crypto that would be transferred from Prime to or for the benefit of Swan.

171. On May 25, 2023, the day before Senior Executive met with Nevada FID and two days before the majority of the Transfers took place, Prime created a single internal sweep "account" designation on the Internal Ledger titled "PT FBO Swan Customers"[74] to facilitate the Transfers from Prime to or for the benefit of Swan. This "PT FBO Swan Customers" account name did not exist prior to May 25, 2023, on the Internal Ledger or as the title of any actual bank account or digital wallet.

172. The "PT FBO Swan Customers" account designation on the Internal Ledger was misleading because there was no trust or FBO account. Rather, Prime made the Transfers to or for the benefit of Swan during the Preference Period from Omnibus Bank Accounts and Omnibus Digital Wallets. The "PT FBO Swan Customers" designation was just an internal account label used on Prime's Internal Ledger.

173. The "FBO" account title created the false appearance that the fiat and crypto Prime was transferring to or for the benefit of Swan had been held in trust in segregated bank accounts and digital wallets on behalf of Swan's customers the *entire* time the fiat and crypto was held at Prime, which was not the case.

174. By doing so, Swan again was trying to shield itself from potential preference actions and avoidance in Prime's impending bankruptcy proceedings.

175. This was a topic of serious discussion amongst Swan and Prime employees involved in conducting the Transfers from Prime to or for the benefit of Swan. Starting on May 24,

---

[74] Like other "accounts" at Prime, the "PT FBO Swan Customers" account did not consist of an actual, segregated bank account or digital wallet that actually held assets. Instead, it was simply a designation on Prime's Internal Ledger.

2023, several Slack messages were exchanged between Swan and Prime to handle the logistics of the Transfers.

176.   In one Slack message on May 25, 2023, for example, Brendan Lane ("Mr. Lane") of Swan asked ███████ and █████████████, another Prime employee, a series of questions about the new "FBO account", with a particular focus on which company owned the account. As Mr. Lane phrased it, there were "legal implications" if Swan owned this account, "the obvious one being that [Swan is] not a [money transmitter]."[75]

177.   ████████ replied that the account would be called "PT FBO Swan Customers."

178.   Swan employee Saj Akhtar ("Mr. Akhtar") also jumped in to ask whether Prime would own the account. ████████ clarified: "Correct, a PT owned FBO account."

> "Brendan Lane" <"brendan@swanbitcoin.com"@Slack> To █████████████@primetrust.com"@Slack>, "███@primetrust.com" <███@primetrust.com"@Slack>, ████████@primetrust.com"@Slack>, "██████ <"███@primetrust.com"@Slack>, ████████@primetrust.com"@Slack>, "Yan Pritzker" <"yan@swanbitcoin.com"@Slack>, ████████@primetrust.com"@Slack>, "Jeremy Showalter" <"jeremy@swanbitcoin.com"@Slack>, ████████@primetrust.com"@Slack>, ████ <"███martin@primetrust.com"@Slack>, "Gui Gomes" <"gui@swanbitcoin.com"@Slack>, "Saj Akhtar" <"saj@swanbitcoin.com"@Slack>, "Sheetal Ray" <"sheetal@swanbitcoin.com"@Slack>, "Bill " <"bill@swanbitcoin.com"@Slack>
>
> that is great news!
>
> @████████ @████ can you confirm more info on the FBO account idea
>
> 1. operationally, is it a requirement (in order to send a single wire + single BTC on chain tx)
> 2. legally, is it a requirement to move from customer account to a new location prior to doing an aggregated tx out
> 3. what would be the legal title of this account?  i heard you say "FBO" but who owns it FBO who?
> trying to understand the options and legal implications.  the obvious one being we are not a MT
>
> *May 25, 2023 12:50 PM (Eastern)*

---

[75]   Because Swan was not a money transmitter, it was not licensed to receive cash or crypto into an account it owned and then disburse that cash and crypto to another custodian without violating money transmitter laws.







179.    The internal sweep "PT FBO Swan Customers" account on the Internal Ledger was owned by Prime.

180.    Swan was well-aware of this fact because Swan could not transfer funds to its customers without the requisite MTLs.

181.    Swan employees Mr. Akhtar and Ms. Ray confirmed several times that Prime was going to first conduct an internal transfer of fiat and crypto into the sweep "PT FBO Swan

Customers" account on the Internal Ledger before fiat and crypto was transferred to or for the benefit of Swan.



## C.    Prime Transferred Fiat and Crypto to or for the Benefit of Swan Immediately After Prime's Meeting with Nevada FID

182.    Prime executed several of the Transfers in the early hours of May 27, 2023

183.    On May 27, 2023, the day after Senior Executive's meeting with Nevada FID, Swan asked Prime to execute two transfers of BTC to or for the benefit of Swan, one transfer for 3,313.16556 BTC and a second transfer for 6,766.94294 BTC (totaling 10,080.1085 BTC and,

together, the "May 27, 2023 BTC Transfers").[76] Just these two May 27, 2023 BTC Transfers accounted for *almost 85%* of the total amount of BTC that Prime transferred to or for the benefit of Swan during the Preference Period.

184. Once Prime sent the first round of crypto Transfers, Mr. Pritzker confirmed receipt in Swan and Prime's group chat on Slack.

---

[76] *See* Ex. B, Brennan Decl., ¶ 154.





### D. The Transfers Depleted Prime's Estates and Accelerated Prime's Descent into Bankruptcy

185. Between May 31, 2023 and June 14, 2023, Prime transferred, to or for the benefit

of Swan, another 1,913.9715 BTC. These transfers increased Prime's total transfers of BTC to or

for the benefit of Swan during the Preference Period to 11,994.08 BTC (when combined with the May 27, 2023 BTC Transfers) (collectively "BTC Transfers").[77]

186.    In addition to the BTC Transfers, Prime transferred 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, and 91,144 XRP (collectively, with the 11,994.08 BTC Transfers, the "Crypto Transfers") to or for the benefit of Swan, during the Preference Period.[78]

187.    API log audit data confirms that all of the Crypto Transfers were directed by Swan. Specifically, Aleksandar Dozic, David Song, and other Swan employees or agents utilizing the username "givebitcoin-api", and the email addresses aleks@swanbitcoin.com, david@swanbitcoin.com, and api@givebitcoin.io respectively, directed some of the Crypto Transfers to or on behalf of Swan.[79]  The other Crypto Transfers were executed by ███████ ████ and ████████ of Prime, utilizing the email addresses ██████@primetrust.com and █████@primetrust.com, respectively, in accordance with Swan's instructions and to or for the benefit of Swan.[80]

188.    Blockchain data confirms that the Crypto Transfers were made directly from Prime to or for the benefit of Swan.[81]

---

[77]    See Ex. B, Brennan Decl., ¶ 144.

[78]    See id.  Similar to the BTC Transfers, Prime transferred the vast majority of the USDC and XRP to or for the benefit of Swan in one day.  On May, 27, 2023, the day after the May 26, 2023 BTC Transfers, Prime transferred 9,135 USDC and 91,144 XRP to or for the benefit of Swan.  This transfer of USDC accounted for 99% of the USDC that was transferred to or for the benefit of Swan during the Preference Period and this transfer of XRP accounted for 100% of the XRP that was transferred to or for the benefit of Swan during the Preference Period. See id. ¶ 159.

[79]    See id. ¶ 151.

[80]    See id. ¶ 152.

[81]    See id. ¶¶ 162–166.

189.    In addition to the Crypto Transfers, during the Preference Period, Prime transferred $24,656,266.14 USD to of for the benefit of Swan (the "Fiat Transfers") according to Prime's bank data, API log audit data, Jira tickets,[82] email correspondence, and Slack communications.

190.    API log audit data confirmed that David Song, utilizing the email address david@swanbitcoin.com, and Swan employees or agents under the username "givebitcoin-api" and utilizing the email address api@givebitcoin.io, directed some of the Fiat Transfers to or for the benefit of Swan.  The remaining Fiat Transfers containing API information were executed by ███████████, utilizing the email address ██████@primetrust.com, to or for the benefit of Swan.[83]

191.    Swan transferred 1.44 BTC of potential subsequent new value to Prime after receiving certain Crypto Transfers during the Preference Period.[84]  Thus, Swan's crypto preference exposure is no less than 11,992.64 BTC, 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, and 91,144 XRP (the "Crypto Preferential Transfers").[85]

192.    Swan transferred $2,223,693.00 of potential subsequent new value to Prime after receiving certain Fiat Transfers during the Preference Period.[86]  Thus, Swan's fiat preference exposure is no less than $22,432,573.14 (the "Fiat Preferential Transfers").[87]

---

[82]    Jira is a ticketing system that Prime used to manage task workflow.  *See* Ex. B, Brennan Decl., ¶ 174 n.44.

[83]    *See id.* ¶ 172.  Ten other transfers totaling $12.1 million did not contain API information; however, Jira tickets show these transactions were initiated by Prime employees to or for the benefit of Swan.  Only one outgoing ACH transaction of $6,479.20 did not have any API information nor any related Jira ticket.  *See id.* ¶ 174, n.45.

[84]    *See id.* ¶ 145.

[85]    *See id.*

[86]    *See id.* ¶ 168.

[87]    *See id.*

193.    Between May 26, 2023 and June 14, 2023, at Swan's direction, in ten transactions, Prime transferred 11,627.98 BTC (or 96.9% of the total BTC Transfers) to Swan at Swan's digital address that Swan provided, ending in ~e7mf (the "~e7mf Wallet").[88]

194.    11,627.979 BTC were subsequently transferred from the ~e7mf Wallet to a digital address ending in ~ehm2 (the "~ehm2 Wallet"):[89]



195.    Additionally, between May 27, 2023 and May 31, 2023, at Swan's direction, in four transactions, Prime transferred a total of 0.991 USDT, 9,234.91 USDC, and 0.01 ETH to Swan at Swan's digital address that Swan provided to Prime, ending in ~7256 (the "~7256 Wallet").[90]

196.    0.991 USDT, 9,234.910 USDC, and 0.0091 ETH were subsequently transferred from the ~7256 Wallet to a digital address ending in ~cfff (the "~cfff Wallet").[91]

---

[88]    *See id.* ¶¶ 162–63.

[89]    *See id.* ¶¶ 162–64.

[90]    *See id.* ¶ 165.

[91]    *See id.* ¶ 166.

**E.    Swan's Transfers Were Highly Unusual and Not in the Ordinary Course of Swan's Business with Prime**

197.    The Transfers were highly unusual for Swan and certainly not in the ordinary course of Swan's business dealings with Prime.[92]

198.    For example, in the three-month period prior to the Preference Period, from February 14, 2023 through May 15, 2023 (the "Pre-Preference Period"), Prime transferred 3,938.04 BTC to Swan across 44,995 transfers.[93]  During the Preference Period, Prime transferred 11,994.08 BTC to Swan across 5,279 transfers, or 205% more than in the three months prior to the Preference Period. [94] The average value of each outgoing transfer of BTC increased by 2,496%, from 0.09 BTC to 2.27 BTC.[95]  Moreover, the Preferential Transfers of BTC represented 75% of the total BTC that Prime transferred to Swan during the Pre-Preference Period and the Preference Period.

199.    The chart below shows the difference in outgoing crypto transfers during the Pre-Preference Period in blue compared to outgoing Crypto Transfers during the Preference Period in orange by crypto type.[96]

---

[92]    *See id.* ¶¶ 141–142, 147–150, 169–171.

[93]    *See id.* ¶ 148

[94]    *See id.*

[95]    *See id.*

[96]    *See id.* ¶ 150.



200.    The average value of Swan's outgoing Fiat Transfers significantly increased by *818%* from $16,077.78 in the Pre-Preference Period to $147,642.31 during the Preference Period. Meanwhile, Swan's average value of incoming fiat transfers declined by 29% from $527.23 during the Pre-Preference Period to $375.43 during the Preference Period.[97]

201.    As these figures demonstrate, the Transfers that Swan directed Prime to make to or for the benefit of Swan during the Preference Period were most certainly not in the ordinary course of its business dealings with Prime.

*    *    *

202.    In sum, Swan was one of Prime's most important customers.   The parties' relationship was so intertwined that Senior Executive, a longtime executive at Prime, also served as a central and trusted paid advisor to Swan.  Swan and Prime together developed their nascent

---

[97]    *See id.* ¶ 170.

businesses into crypto industry behemoths.  Just as Prime was spiraling downward financially, Swan—aware of Prime's struggles before the rest of the industry knew—instructed Prime to transfer a significant amount of fiat and crypto from Prime to or for the benefit of Swan.

203.    The calendar below illustrates the situation almost as well as any narrative could. Prime is thus entitled to recover the certain of the Transfers which are clearly preferential.

## May·2023.

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|  | Senior·Executive·starts·encrypted·message·with·Mr.·Klippsten·and·sets·to·auto-delete. | Prime·transfers·¶ $752,545·USD·to·or·for·the·benefit·of·Swan. | ▇▇▇▇▇ from·Fortress·meets·with·Prime·stakeholders·to·discuss·deal. | Swan·notifies·Prime·of·new·plan·to·urgently·transfer·all·fiat·&·crypto·from·Prime·to·or·for·the·benefit·of·Swan·(not·just·Connecticut)¶ ¶ Prime·and·Swan·discuss·creating·an·Internal·Ledger·account·designation·titled·"PT·FBO·Swan·Customers." | Senior·Executive·and·others·from·Prime·meet·with·the·Nevada·FID.¶ ¶ Prime·transfers·$10.3·million·USD·and·0.001·BTC·to·or·for·the·benefit·of·Swan.¶ | Prime·transfers·10,083.89·BTC,·0.01·ETH,·0.9914·USDT,·9,135·USDC,·and·91,144·XRP·to·or·for·the·benefit·of·Swan. |
| 28 | 29 | 30 | 31 |  |  |  |
|  |  | Prime·transfers·¶ $10·million·USD·to·or·for·the·benefit·of·Swan. | Prime·transfers·1,147.16·BTC·and·99.91·USDC·to·or·for·the·benefit·of·Swan. |  |  |  |

## June·2023.

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
|  |  |  |  | 1 | 2 | 3 |
|  |  |  |  | Prime·transfers··¶ 367.0546·BTC·to·or·for·the·benefit·of·Swan. |  |  |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|  |  | Prime·transfers·24.108·BTC·to·or·for·the·benefit·of·Swan. |  | Prime·transfers·6.888·BTC·to·or·for·the·benefit·of·Swan. | Prime·transfers·3.575·BTC·to·or·for·the·benefit·of·Swan. |  |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
|  |  |  | Prime·transfers·1.405·BTC·to·or·for·the·benefit·of·Swan. |  |  |  |

**VII.    The Transfers From Prime to or for the Benefit of Swan During the Preference Period Are Avoidable**

**A.    The Transfers Constitute Avoidable Preferential Transfers**

204.    Section 547 of the Bankruptcy Code authorizes a trustee to avoid a preferential transfer of "an interest of the debtor in property" if five conditions are met.

205.    First, the transfer must be "to or for the benefit of a creditor."[98]

206.    Second, the transfer must be "for or on account of an antecedent debt owed by the debtor before such transfer was made."[99]

207.    Third, the transfer must have been "made while the debtor was insolvent."[100]

208.    Fourth, the transfer must have been made during the 90-day period immediately preceding the filing of the bankruptcy petition.[101]

209.    Finally, the transfer must have enabled the creditor to whom the transfer was made (or for whose benefit the transfer was made) to receive a greater recovery on account of its claim than it would receive in a hypothetical case under chapter 7 of the Bankruptcy Code had such transfer not been made.[102]

210.    The Preferential Transfers to or for the benefit of Swan were transfers of an interest of Prime's property to or for the benefit of Swan during the Preference Period.

211.    Prime executed the Preferential Transfers during the Preference Period to satisfy the debt Prime owed to Swan under the Agreements.[103]

---

[98]    11 U.S.C. § 547(b)(1).

[99]    11 U.S.C. § 547(b)(2).

[100]    11 U.S.C. § 547(b)(3).

[101]    11 U.S.C. § 547(b)(4).

[102]    11 U.S.C. § 547(b)(5)(A)–(C).

[103]    The Prime entity which made the Transfers to or for the benefit of Swan was Prime Trust, LLC.

212.    The Preferential Transfers were made while Prime was insolvent. As of the Petition Date, Prime held approximately $44,171,095.91 worth of assets as compared to $179,346,900.50 in liabilities.[104] If not avoided, the Preferential Transfers will enable Swan to receive more than Swan would have received on account of its claim in a hypothetical liquidation under chapter 7 had Prime not made the Transfers in satisfaction of Prime's antecedent debt to Swan.[105]

213.    Based upon the due diligence evaluation of the reasonably knowable affirmative defenses to avoidance of the Preferential Transfers during the Preference Period performed by Plaintiff and the third-party expert retained in this matter, Plaintiff has determined that it may avoid many of the Transfers even after taking into account Swan's alleged affirmative defenses.[106] Accordingly, certain of the Transfers to Defendant must be returned.[107]

214.    Swan transferred $2,223,693.00 and 1.44 BTC of potential subsequent new value to Prime after receiving certain of the Transfers from Prime during the Preference Period.[108] Therefore, Swan's preference exposure is no less than $22,432,573.14 USD, 11,992.64 BTC, 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, and 91,144 XRP.[109]

---

[104]    *See Schedules of Assets and Liabilities for Prime Core Technologies Inc. (Case No. 23-11161)* [Docket No. 175]; *Schedules of Assets and Liabilities for Prime Trust, LLC (Case No. 23-11162)* [Docket No. 176]; *Schedules of Assets and Liabilities for Prime IRA LLC (Case No. 23-11164)* [Docket No. 177]; *Schedules of Assets and Liabilities for Prime Digital, LLC (Case No. 23-11168)* [Docket No. 178].

[105]    *See Notice of Filing of Revised Liquidation Analysis* [Docket No. 497].

[106]    It is Swan's obligation to establish any affirmative defenses it asserts in this action, including any subsequent new value defense.

[107]    *See* 11 U.S.C. §§ 547(b), 550.

[108]    *See* Ex. B, Brennan Decl., ¶¶ 145, 168.

[109]    *See id.*

**B.**     **In the Alternative, the Transfers Constitute Avoidable Actual Fraudulent Transfers**

215.     The Transfers occurred within two years of the Petition Date and Prime made the Transfers to or for the benefit Swan with the actual intent to hinder, delay, or defraud its creditors.

216.     The Transfers were comprised of property in which Prime had an interest.

217.     The circumstances surrounding the Transfers demonstrate sufficient badges of fraud, including without limitation that: (i) Prime was facing legal action, including from Nevada FID; (ii) the value of the consideration received by Prime was not reasonably equivalent to the value of the Transfers; (iii) Prime removed the Transfers from its platform and accounts at Swan's direction; (iv) Prime was insolvent at the time of or shortly after the Transfers occurred; and (iv) the Transfers constituted a large portion of Prime's assets and value for Prime's estate.

218.     Thus, in the alternative, the Transfers are actual fraudulent transfers subject to avoidance pursuant to Bankruptcy Code section 548(a)(1)(A) and sections 1304 and 1305 of Title 6 of the Delaware Code.[110]

219.     During the course of this proceeding, PCT may learn (through discovery or otherwise) of additional transfers made to or for the benefit of Swan during the Preference Period and/or constituting fraudulent transfers.  It is PCT's intention to avoid and recover all transfers made by Prime of an interest of Prime in property that were made to or for the benefit of Swan or any other transferee.  PCT reserves its right to amend this original Complaint to include: (i) further information regarding the Transfers; (ii) additional transfers; (iii) modifications of and/or revision to Swan's name; (iv) additional defendants; and/or (v) additional causes of action, if applicable (collectively, the "Amendments"), that may become known to PCT at any time during this

---

[110]   *See* 11 U.S.C § 548(a)(1)(A); Del. Code Ann. tit. 6, §§ 1304(a)(1) and 1305.

Adversary Proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

**VIII.    The Transfers Involved Commingled Fiat and Crypto, Rendering Swan Unable to Trace All of the Fiat and Crypto It Originally Transferred to Prime**

220.    Swan did not transfer substantial amounts of BTC to Prime.  Throughout its entire relationship with Prime, Swan used fiat currency it transferred to Prime to purchase BTC through Prime.[111]

221.    The Transfers from Prime to or for the benefit of Swan were comprised of commingled fiat and crypto that Prime had not segregated into separate bank accounts or digital wallets, respectively.  As a result of this extensive commingling, Swan will be unable to trace the all of the fiat or crypto it originally transferred to Prime to the Fiat Preferential Transfers and the Crypto Preferential Transfers.

**A.    Prime Commingled Fiat in Omnibus Bank Accounts in Prime's Name**

222.    The fiat that Swan and other Prime customers transferred to Prime was not segregated into separate bank accounts by customer.[112]  Instead, the fiat was held in Omnibus Bank Accounts in Prime's name containing fiat other customers transferred to Prime as well as fiat that Prime generated from its own business operations.[113]

---

[111]    *See* Ex. B, Brennan Decl., ¶¶ 140, 141.

[112]    *See id.* ¶ 28.

[113]    *See id.*

223.    The majority of the Fiat Preferential Transfers from Prime to or for the benefit of Swan during the Preference Period were transferred from one of Prime's accounts at BMO Harris Bank, N.A. ("BMO") ending in 3077 ("BMO x3077").[114]

224.    The BMO Agreement specifically provides that the BMO Agreement "*is not for the benefit of any other person and no other person shall have any right against [Prime] or [BMO Harris] hereunder.*"[115]

225.    The BMO Agreement does not state that fiat was held "in trust for" or "for the benefit of" any party other than Prime.[116]

226.    Indeed, in Prime's onboarding documents with BMO, Prime designated "Prime Trust, LLC" as the sole "Legal Entity for Which Beneficial Ownership is Being Provided."[117]

227.    Prime regularly transferred fiat between its various Omnibus Bank Accounts, further commingling funds.[118]

228.    For example, Prime used BMO x3077 primarily to make wire transfers.[119]

229.    BMO x3077 held commingled funds that it regularly received from other Prime Omnibus Bank Accounts and from other Prime customers.[120]

---

[114]    *See id.* ¶ 176. *See also* Treasury Master Services Agreement, dated January 14, 2022, between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Agreement"). A copy of the BMO Agreement is attached as Exhibit J. The remaining 2% of the Transfers were from other Prime bank accounts at CRB and Lexicon, including CRB x4453 and Lexicon x0803. *See* Ex. B, Brennan Decl., ¶ 176.

[115]    *See* Ex. J, BMO Agreement, § 15(e) (emphasis added).

[116]    *See id.*

[117]    *See* Certification Regarding Beneficial Owners of Legal Entity Customers between Prime Trust, LLC and BMO Harris Bank N.A. (the "BMO Certification"). A copy of the BMO Certification is attached as Exhibit K.

[118]    *See* Ex. B, Brennan Decl., ¶¶ 91–101.

[119]    *See id.* ¶ 92.

[120]    *See id.* ¶¶ 93–94.

230.    At the end of each day, Prime typically swept any unused funds remaining in BMO x3077 to another BMO account ("BMO x9934"), because the latter account offered a higher rate of interest.[121]

231.    Prime primarily used Cross River Bank ("CRB") accounts ("CRB x9892" and "CRB x4453") for internal transfers and payments via ACH.[122]

232.    CRB bank accounts also held commingled funds from other Prime Omnibus Bank Accounts and from other Prime customers.[123]

233.    Prime moved funds between its different bank accounts, regardless of the source of the funds, on an as-needed basis to satisfy wire and ACH transfer requests.[124]

234.    Prime typically made transfers between its Omnibus Bank Accounts in round numbers, without reference to any specific transactions.[125]  This suggests that Prime simply moved funds between its Omnibus Bank Accounts on an estimated, as-needed basis instead of in response to specific transaction activity.[126]

235.    Prime would also transfer fiat between bank accounts that were primarily used for Prime's corporate operations and Omnibus Bank Accounts that contained fiat transferred to Prime by its customers.[127]

---

[121]    *See id.* ¶ 95.  BMO's terms and conditions provided that "interest-bearing accounts will bear interest at annual rates that we may establish and change from time to time in our discretion."  *See* BMO Harris Bank N.A. Commercial Account Agreement Terms and Conditions, dated July 2021, attached as Exhibit L, § 25. Because Prime designated itself as the beneficial owner of its BMO accounts, Prime was entitled to the interest produced by these accounts (consistent with the Agreements).  *See* Ex. K, BMO Certification.

[122]    *See id.* ¶ 98.

[123]    *See id.* ¶¶ 97–98.

[124]    *See id.* ¶ 91.

[125]    *See id.* ¶ 101.

[126]    *See id.* ¶¶ 91, 101–102.

[127]    *See id.* ¶ 90.

236.    Because Prime did not segregate fiat transferred to it from one customer from fiat transferred to it from another customer, or from fiat generated from Prime's business operations, Prime attempted to keep track of what it owed each of its customers by noting the amounts it owed on its Internal Ledger.[128]

237.    ▮▮▮▮▮▮▮ ("▮▮▮▮▮"), Prime's former Chief of Regulatory Affairs, testified that Prime employees checked Prime's Internal Ledger to determine the amounts that Prime owed to its customers:

> Q:    And if we wanted to look at how much Prime Trust owed each individual customer at a particular time versus how much cash and crypto Prime Trust had in its possession, how would we do that?
>
> A:    I would pull the general ledger record out of the Prime Trust Core system.[129]

238.    However, Prime's internal cash management practices make identifying which bank account transfers correspond with which specific customer transactions reported on Prime's Internal Ledger extremely difficult.[130]

## B.    Prime Commingled Crypto in Omnibus Digital Wallets in Vaults

239.    As was the case with Prime's commingling of fiat, Prime did not maintain separate or segregated digital wallets for crypto.[131]  Instead, Prime had Omnibus Digital Wallets that commingled crypto transferred to Prime from different customers with Prime's own crypto that it used for corporate operations and purposes.[132]

---

[128]    *See id.* ¶¶ 88–90.

[129]    Deposition of ▮▮▮▮▮▮▮, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023) (the "▮▮▮ Dep."), 89: 19–25.

[130]    *See* Ex. B, Brennan Decl., ¶ 94.

[131]    *See id.* ¶ 28.

[132]    *See id.*

240.   Prime maintained its Omnibus Digital Wallets in Prime's vaults ("Vaults") at Fireblocks LLC ("Fireblocks"), a third-party crypto security platform.[133]   Prime used Vaults within the Fireblocks infrastructure to: (i) organize wallets (including the Omnibus Digital Wallets), (ii) enhance security measures, and (iii) leverage efficient transaction policies and access controls.[134]   Vaults at Fireblocks were not separated or segregated by digital wallets.[135]

241.   Prime provided customers with receiving digital wallet addresses (the "Receiving Digital Addresses") for sending crypto to Prime.[136]   From time to time, Prime would conduct "sweeps" of those different Receiving Digital Addresses to transfer crypto from those Receiving Digital Addresses into one or more of the shared Omnibus Digital Wallets controlled by Prime.[137] This process commingled crypto transferred to Prime by different customers together in the Omnibus Digital Wallets.[138]

242.   Prime's internal process for performing sweeps was inconsistent and void of procedural safeguards.[139]   Prime's application could trigger a sweep based on certain unknown events occurring or an employee could manually perform a sweep at any given time.[140]

---

[133]   *See id.* ¶ 29.

[134]   *See id.*

[135]   *See id.*

[136]   *See id.* ¶ 30.

[137]   *See id.* ¶ 31.

[138]   *See id.*

[139]   *See id.* ¶ 32

[140]   *See id.*

243.    Prime also regularly transferred crypto between its multiple Omnibus Digital Wallets, only further commingling the already commingled crypto contained in the Omnibus Digital Wallets.[141]

244.    As discussed previously, in an attempt to track its crypto balances on behalf of its customers, Prime recorded its customers' transfers of crypto to and from Prime on its Internal Ledger.[142]  When a customer transferred crypto to Prime, Prime would credit that amount on its Internal Ledger.[143]  The Internal Ledger, however, did not track to which Omnibus Digital Wallet(s) any specific crypto was transferred into when Prime swept Receiving Digital Address(es).[144]

245.    When a customer requested to transfer crypto from Prime, Prime would first verify the crypto balance that the customer supposedly had from the Internal Ledger to determine whether the customer had previously transferred sufficient crypto to Prime to support the outgoing transfer amount.[145]

246.    If the customer had transferred sufficient crypto, Prime would then check its multiple Omnibus Digital Wallets to determine from which Omnibus Digital Wallet(s) it could source the requisite amount of crypto to satisfy the transfer request.[146]  Prime would then transfer the requested amount of crypto to the customer.[147]

---

[141]    *See id.* ¶ 33.

[142]    *See id.* ¶ 34.

[143]    *See id.* ¶ 35.

[144]    *See id.*

[145]    *See id.* ¶ 40.

[146]    *See id.*

[147]    *See id.*

247.    In completing a transfer request, Prime did not transfer the same crypto that a customer had initially transferred to Prime via its respective Receiving Digital Address because Prime's Omnibus Digital Wallets did not segregate crypto by customer and, thus, could not be used to identify any original crypto transferred to Prime by a specific customer.[148]

248.    To demonstrate the extent of Prime's commingling of crypto, the Brennan Declaration discusses and illustrates several examples of commingling taken from transaction, blockchain, and other data.[149]

249.    For example, Prime frequently swept crypto from the Receiving Digital Addresses into one of Prime's Omnibus Digital Wallets with a digital address ending in ~b2ea (the "~b2ea Wallet").[150]

250.    The Brennan Declaration provides an example of how three separate Prime customers sent crypto to their respective, unique Receiving Digital Addresses, which Prime subsequently swept into the ~b2ea Wallet[151]:

---

[148]    *See id.*

[149]    *See id.* ¶¶ 42–87.

[150]    *See id.* ¶ 42.

[151]    *See id.* ¶ 44.



251.     Just this one example illustrates how Prime commingled crypto transferred to it from three different customers into a single Omnibus Digital Wallet.  This type of transaction occurred multiple times with the ~b2ea Wallet and with other Omnibus Digital Wallets.[152]

252.     The Brennan Declaration also discusses how the crypto that customers transferred to Prime became further commingled with crypto that Prime used for its own corporate operations.

253.     Again using the ~b2ea Wallet as an example, Brennan describes how the ~b2ea Wallet received crypto from a Prime wallet that itself was funded from thousands of different wallets holding Prime's own crypto.[153]  This resulted in Prime's crypto, which was used for its own corporate operations, becoming commingled with crypto that customers had transferred to Receiving Digital Addresses which Prime had already previously swept and commingled into this Omnibus Digital Wallet.[154]

254.     Prime's commingling of crypto was further compounded by Prime's movement of commingled crypto between multiple Omnibus Digital Wallets.  Again, using the ~b2ea Wallet as

[152]   *See id.* ¶ 43–45.

[153]   *See id.* ¶ 47.

[154]   *See id.* ¶¶ 47–50.

an example, the Brennan Declaration discusses and illustrates how Prime transferred already commingled crypto between multiple Omnibus Digital Wallets[155]:



255.    The Brennan Declaration also discusses and illustrates how Prime's commingling of crypto in Omnibus Digital Wallets makes it practically impossible to determine if the crypto transferred from Prime to a customer to satisfy a transfer request included any of the original crypto that specific customer had originally transferred to Prime.[156]

256.    The below illustration shows that while the ~b2ea Wallet received crypto swept from the Receiving Digital Address of one of Prime's customers (designated as Customer A in the below illustration) and from Prime's "PT Segregated Assets" digital wallet that held corporate crypto, Prime transferred crypto out of this ~b2ea Wallet to satisfy outgoing transfer requests from

---

[155]    *See id*. ¶ 50.

[156]    *See id*. ¶ 52.

two completely different Prime customers.[157]  These outgoing crypto transfers may have included

some or none of the crypto originally transferred to Prime by this Customer A or from Prime's

other customers.[158]



257.    Similarly, Prime often used the digital wallet with a digital address ending in ~73ck

(the "~73ck Wallet") for BTC transferred to Prime from numerous customers as well as BTC

transferred from other Prime Omnibus Digital Wallets, which also held BTC transferred to Prime

by multiple customers.[159]  This resulted in extensive commingling of BTC.[160]



---

[157]    *See id.* ¶¶ 46–49.

[158]    *See id.* ¶ 49.

[159]    *See id.* ¶¶ 53–56.

[160]    *See id.* ¶ 54.

258.  Prime also commingled USDT, USDC and XRP.[161]

259.  The diagram below illustrates an example of a USDT transaction by a Prime customer (designated as Customer A in the below illustration) that transferred USDT to a Receiving Digital Address at Prime, which was then swept into one of Prime's Omnibus Digital Wallets with the digital address ending in ~df94 (the "~df94 Wallet") where it was immediately commingled with USDT that had been transferred to Prime by other customers.  To cover the gas fees associated with the USDT transaction, Prime used ETH from commingled ~df94 Wallet.[162]



260.  Prime commingled USDC in a similar manner.  In a sample transaction, the Brennan Declaration shows how the USDC that Swan and another Prime customer (designated

---

[161]  *See id.* ¶¶ 57–66.

[162]  *See id.* ¶¶ 57–60.

Customer B in the below illustration) transferred from their external digital wallets with digital addresses ending in ~4c79 and ~5023 into Receiving Digital Addresses ending in ~5c79 and ~154b at Prime was swept into the ~b2ea Wallet, where it was then immediately commingled with USDC that had been transferred to Prime by other customers.[163]



261.    Prime also commingled XRP.  For instance, in the below example, Prime Omnibus Digital Wallet ending in ~FroN (the "~FroN Wallet") received XRP from two different Prime customers (designated Customer A and Customer B in the below designation) with external digital wallet addresses ending in ~7xDH and ~WouF, respectively.  As shown below, Swan and another

---

[163]   *See id.* ¶¶ 61–64.

Prime customer (designated Customer D in the below illustration) with external digital wallet addresses ending in ~GP5y and ~gESv, respectively, transferred XRP to the Prime Omnibus Digital Wallet ending in ~1gjn (the "~1gjn Wallet"). The ~1gjn Wallet received commingled crypto from the ~FroN Wallet, further commingling the XRP in Prime's Omnibus Digital Wallets.[164]



### C.    Prime Pooled Crypto Together to Reduce Transaction Fees

262.    Prime generally swept crypto from the Receiving Digital Addresses into shared Prime Omnibus Digital Wallets to pool crypto together for a number of reasons.[165]

263.    One primary reason for pooling crypto together was that Prime and its customers could bypass and save on various transaction fees[166] that would otherwise be incurred by

---

[164]    *See id.* ¶¶ 65–66.

[165]    *See id.* ¶¶ 67–70.

[166]    We use "transaction fees" to refer to both "gas fees" for ETH, USDC, and USDT transactions and BTC transaction fees herein, but only use the term "gas fees" to refer to transaction fees incurred for ETH, USDC, and USDT on the Ethereum network. *See id.* ¶¶ 24–26.

conducting transactions on the blockchain.[167]   Specifically, for crypto transfers within a single

Prime Vault at Fireblocks, Prime could simply move the funds around on its Internal Ledger rather

than conduct any transactions on the blockchain which would otherwise incur transaction fees.[168]

When Prime did conduct on-chain transactions, it reduced transaction fees by pooling transactions

and performing them during off-peak hours when the blockchain network was less congested as

illustrated in the below diagram.[169]



264.   By sweeping BTC together that had been transferred to Prime by multiple

customers, including Swan, Prime's commingling of BTC makes distinguishing the original digital

wallet from which the BTC originated from nearly impossible.[170]

---

[167]   *See id*. ¶ 69.

[168]   *See id*. ¶ 70.

[169]   *See id*. ¶¶ 70–72.

[170]   *See id*. ¶¶ 71–75.

265.    To help account for the gas fees Prime incurred for transacting in USDC, USDT, ETH or other cryptocurrencies on the Ethereum blockchain, Prime set up additional digital wallets it referred to collectively as the "Gas Stations."[171]  Prime funded the Gas Stations from various other wallets (including the Prime Omnibus Digital Wallets) and used the Gas Stations to pay gas fees when Prime conducted on-chain transactions, further commingling crypto transferred to Prime by customers with Prime's own crypto.[172]

266.    As demonstrated below, funding sources for the Gas Stations (represented by bright green nodes) included Prime's Omnibus Digital Wallets (represented by green nodes at the top), customers' external digital wallets (represented by the pink, blue, red and yellow nodes) and several external digital wallets that appear to be unattributable to Prime or its customers (represented by gray nodes)[173]:



---

[171]    *See id.* ¶ 78.

[172]    *See id.* ¶¶ 78–79.

[173]    *See id.* ¶ 80.

267.    Prime communications, as shown below, also reflect instances where Prime operations personnel used fiat from one of Prime's commingled Omnibus Bank Accounts to purchase ETH to refill the Gas Stations.[174]

268.    Therefore, the Gas Stations were funded by Prime's corporate fiat, crypto from commingled Prime Omnibus Digital Wallets (including the ~b2ea Wallet described above), and crypto from external digital wallet addresses.[175]

269.    In sum, by sweeping and pooling crypto together, Prime was able to reduce transaction fees but commingled crypto transferred to Prime by customers with Prime's corporate crypto in several different ways throughout the process.[176]

---

[174]    *See also id.* ¶¶ 82–84.

[175]    *See id.* ¶¶ 84–86.

[176]    *See id.*

### D.     Prime Did Not Keep a Perfect Match of Its Assets

270.    A comparison of the fiat and BTC recorded on Prime's Internal Ledger with the fiat and BTC held in Prime's Omnibus Bank Accounts and Omnibus Digital Wallets established that Prime routinely had a significant shortfall in fiat and BTC.[177]

271.    Prime failed to maintain the perfect match for crypto and fiat because, as noted above, the Agreements entitled Prime to take title to the assets and fiat and crypto transferred to Prime were commingled in Prime Omnibus Bank Accounts and Prime Omnibus Digital Wallets.[178]

### E.     Prime Did Not Reconcile Fiat or Crypto Transactions

272.    Prime did not conduct regular, timely, or accurate reconciliations to compare the fiat and the crypto recorded in its Internal Ledger with the fiat Prime actually held in Omnibus Bank Accounts and crypto that Prime actually held in its Omnibus Digital Wallets.[179]

273.    Crypto held by Prime is in Prime's Vaults within Fireblocks, and none of that crypto has clear ownership provenance.[180]

274.    Prime's own internal data also presents conflicting information regarding how certain digital wallets were attributed to different entities as well as falsified entries in Prime's Internal Ledger.[181]

---

[177]    *See id.* ¶¶ 230–231.

[178]    *See id.*

[179]    *See id.* ¶¶ 39–40, 104–117.

[180]    *See id.* ¶¶ 109–112.

[181]    *See id.* ¶¶ 118–131.

275. Prime maintained substandard reconciliation processes throughout its history, including with respect to its Internal Ledger.[182] This further hindered the ability of Prime or anyone else to specifically identify which funds were transferred to Prime by which customer.[183]

276. Prime did not perform regular reconciliations of its assets and, at least prior to March 2021, any reconciliations that Prime did conduct were manual.[184]

277. Former Prime employees testified that Prime commingled fiat and crypto transferred to Prime by its customers and that Prime's reconciliation processes were poorly maintained.

278. ████████ testified that "[r]econciliations were not being done in a timely manner."[185]

279. ████████ testified:

Q: Are you aware of any instances in which what would be considered customer assets were commingled with company assets in an account?

A: I think there were instances where that did happen based off of the management in the financial operations team where we might have had balances that they might have commingled, but I don't remember the—I don't remember how that happened.[186]

280. ████████ also testified that "[i]t would not surprise" him if fiat and crypto transferred by customers were commingled with company assets because "the hygiene of the financial operations team, in retrospect, was not as good as it should have been."[187]

---

[182] *See id.* ¶¶ 109–117.

[183] *See id.*

[184] *See id.* ¶¶ 39, 109–117.

[185] ████ Dep., 38: 23–24.

[186] Deposition of ████████, *In re Prime Core Technologies*, No. 23-11161 (Bankr. D. Del. Nov. 16, 2023), 41:19–42:4.

[187] *See id.* at 213:15–22.

281.        ████████   testified about Prime's reconciliations processes both before and after March 2021:

Q:    When you say it was a problem, what do you mean?

A:    There just wasn't very good reconciliation tools.  Everything was done manually.  So I was brought in to work on building these tools and making them more automated. . .[188]

282.        ████████   prepared a report for a July 12, 2021, audit committee meeting which identified the risks associated with Prime's handling of fiat and crypto, reconciliation practices, and general mismanagement of corporate functions.  Most of these practices were considered to present "high" or "extreme" levels of risk:

### 2   Finding and Response Summary Matrix

| Risk | Reference | Finding | Target | Response | Completed | Verified |
|---|---|---|---|---|---|---|
| Extreme | 1 | Reconciliation | 03/31/2022 | Yes | | |
| Extreme | 2 | Trust Operations - Suspense Accounts | 12/31/2021 | Yes | | |
| High | 3 | Funds Processing - Funds Availability | 08/31/2021 | Yes | | |
| High | 4 | Funds Processing - Wire Limits | 03/15/2021 | Yes | | |
| High | 5 | Trust Operations - Overdrafts | 06/30/2021 | Yes | | |
| Medium | 10 | Funds Processing - Wire Booking | 06/11/2021 | Yes | | |
| Medium | 11 | Management Reports | 06/30/2021 | Yes | | |

283.    As described above and confirmed in the Brennan Declaration, Prime's repeated transfers of funds between Omnibus Bank Accounts and Omnibus Digital Wallets, and Prime's failure to maintain proper tracking and reconciliation processes, further exacerbated the

---

[188]    ████  Dep., 19:23–20:5.

commingling of fiat and crypto transferred to Prime by Swan with fiat and crypto transferred to Prime by Prime's other customers and fiat and crypto generated from Prime's own business operations.[189]

### F.    Prime Transferred Commingled Crypto to or for the Benefit of Swan

284.    To complete the Crypto Preferential Transfers, Prime transferred crypto from Omnibus Digital Wallets that held commingled crypto.[190]

285.    On May 27, 2023, Prime transferred 6,766.94294 BTC from the ~73ck Wallet and 3,313.16556 BTC from a digital wallet with a digital address ending in ~uscz (the "~uscz Wallet") to or for the benefit of Swan to the ~e7mf Wallet, as shown below[191]:



286.    Prime continued to transfer BTC from the ~73ck and ~uscz Wallets to or for the benefit of Swan until June 1, 2023, ultimately transferring a total of 11,592.00478 BTC to or for the benefit of Swan. This accounted for 97% of the total BTC transferred from Prime to or for the benefit of Swan during the Preference Period.[192]

---

[189]    *See* Ex. B, Brennan Decl., ¶¶ 28–136, 175–232.

[190]    *See id.* ¶¶ 153–160.

[191]    *See id.* ¶ 154–155.

[192]    *See id.* ¶ 158.

287.    On May 27, 2023, Prime also transferred: (i) 9,135 USDC to or for the benefit of Swan from the commingled ~b2ea Wallet, which accounted for 99% of the total USDC Prime transferred to or for the benefit of Swan during the Preference Period; (ii) 91,144 XRP from the commingled ~1gjn Wallet, which accounted for 100% of the total XRP that Prime transferred to or for the benefit of Swan during the Preference Period; and (iii) 0.01 ETH from the commingled ~b2ea Wallet, which accounted for 100% of the total ETH Prime transferred to or for the benefit of Swan during the Preference Period.[193]

288.    Along with Prime's two transfers of BTC to or for the benefit of Swan on May 27, 2023, Prime's transfers of USDC, ETH, and XRP to or for the benefit of Swan on May 27, 2023, accounted for 98% of all of the Crypto Transfers to or for the benefit of Swan during the Preference Period.[194]

289.    Therefore, the majority of the Crypto Transfers were transferred to or for the benefit of Swan from commingled Prime Omnibus Digital Wallets on May 27, 2023.[195]

290.    In sum, all of the Crypto Preferential Transfers to or for the benefit of Swan during the Preference Period originated from Prime Omnibus Digital Wallets containing commingled crypto.  Accordingly, the Crypto Preferential Transfers Prime transferred to or for the benefit of Swan did not consist of the same crypto Swan previously had transferred to Prime but rather of commingled crypto.[196]

---

[193]    *See id.* ¶ 159.

[194]    *See id.*

[195]    *See id.* ¶ 161.

[196]    *See id.* ¶¶ 153–161.

### G.    Prime Transferred Commingled Fiat to or for the Benefit of Swan

291.    Approximately 98% of the total Fiat Transfers, or $24,159,306.46, were sent to or for the benefit of Swan from Prime's BMO x3077 account.[197]  The remaining 2% of Fiat Transfers, amounting to $496,959.68 was sent from other Prime accounts, including CRB x4453 and Lexicon x0803.[198]

292.    As previously alleged, the fiat in Prime's BMO x3077 account was commingled fiat transferred to Prime by multiple customers, including Swan.

293.    Swan transferred $1,171,840.82 to Prime into BMO x3077 during the Preference Period, yet Prime transferred $24,159,306.46 to or for the benefit of Swan in outgoing transfers from BMO x3077.[199]

294.    As the Brennan Declaration explains, Prime would transfer funds from other accounts into BMO x3077 (and vice-versa) in order to have enough funds available in BMO x3077 to satisfy transfers to or for the benefit of Swan and other Prime customers during the Preference Period, further commingling fiat.[200]

295.    The Brennan Declaration examines several days of incoming and outgoing transfers from the BMO x3077 account on May 23, 2023, May 26, 2023, and May 30, 2023, to illustrate the extensive commingling that occurred and what it meant for Preference Period fiat transactions such as Swan's.[201]

---

[197]  *See id.* ¶ 176.

[198]  *See id.*

[199]  *See id.* ¶¶ 176–177.

[200]  *See id.* ¶¶ 93–96, 180–181.

[201]  *See id.* ¶¶ 183–229.  The Brennan Declaration also examines several days of incoming and outgoing transfers from CRB x9892 and CRB x4453 on May 23, 2023, May 26, 2023, and May 30, 2023, which demonstrate extensive commingling. *See id.*

296.    As reflected in the bank records for this account, on May 23, 2023, the beginning balance of BMO x3077 was $147,179.23.[202]

297.    On May 23, 2023, $59,559,547.82 was transferred into BMO x3077.[203]  However, only five of these transfers totaling $22,432.13 were transferred from Swan to Prime.[204]

298.    Conversely, on May 23, 2023, outgoing transfers totaling $59,289,344.55 were transferred from BMO x3077, including three transfers totaling $735,545.00 from Prime to or for the benefit of Swan.[205]

299.    Even if one assumed that the entire beginning balance of BMO x3077 on May 23, 2023, included only fiat previously transferred to Prime by Swan, that would make Swan's total "balance" in BMO x3077 on May 23, 2023, $169,611.36 (*i.e.*, adding the beginning balance of $147,179.23 and Swan's transfer of $22,432.13).

300.    This means that the $735,545.00 transferred from Prime to or for the benefit of Swan on May 23, 2023, would have included $565,933.64 of fiat transferred that day by other Prime customers (*i.e.*, subtracting the beginning balance of $147,179.23 and Swan's transfer of $22,432.13 from the $735,545.00 transfer to or for the benefit of Swan).[206]

---

[202]  *See id.* ¶ 191.

[203]  *See id.*

[204]  *See id.* ¶¶ 185, 191.

[205]  *See id.* ¶¶ 184, 191.

[206]  The Brennan Declaration states that Swan made several other transfers to Prime on May 23, 2023 to CRB x9892, including nine incoming ACH transfers totaling $7,396.33 and three incoming wires totaling $63,000. *See id.* ¶¶ 193–194.  Prime transferred around $5,000,000.00 from CRB x9892 to BMO x3077 on May 23, 2023, therefore, only a maximum of $7,396.33 that Swan transferred to the CRB x9892 may have been included in the outgoing transfers to or for the benefit of Swan from BMO x3077 that same day but cannot be directly attributed as such. *See id.* ¶ 198 n.46.  If the $7,396.33 were included in the transfers from BMO x3077 to or for the benefit of Swan on May 23, 2023, then the $735,545.00 transferred from Prime to or for the benefit of Swan on May 23, 2023, would have included $495,537.31 of fiat transferred that day by other Prime bank accounts and customers.

301.    On May 26, 2023, Swan only conducted three of the total 345 transactions with BMO x3077. Specifically, Swan transferred one incoming transfer of $788.00, whereas that same day, Prime transferred $10,359,33.93 to or for the benefit of Swan over two outgoing transfers.[207]

302.    While nearly all of Prime's outgoing transfers to or for the benefit of Swan on May 26, 2023, were transferred from BMO x3077, the majority of Swan's incoming transfers were transferred into CRB x9892 and CRB x4453.[208]

303.    However, neither CRB x9892 nor CRB x4453 made any transfers to BMO x3077 on May 26, 2023, therefore, as the Brennan Declaration explains, the fiat that Swan transferred into CRB x9892 and CRB x4453 cannot be conclusively attributed to the outgoing fiat transfers from Prime to or for the benefit of Swan on that day.[209]

304.    Similarly, on May 30, 2023, Swan only conducted three out of 309 total transactions that occurred to and from BMO x3077 that day.[210] Specifically, out of all of the incoming transfers to BMO x3077 totaling $39,240,305.65, Swan only transferred one incoming transfer of $26,993.00, whereas that same day, out of all of the outgoing transfers from BMO x3077 totaling $39,312,999.77, Prime transferred $10,098,531.94 to or for the benefit of Swan over two outgoing transfers.[211]

---

[207]   *See id*. ¶ 201.

[208]   *See id*. ¶ 212. The Brennan Declaration states that Swan made seven wire transfers totaling $250,999.00 to CRB x9892 and 2,762 ACH transfers totaling $532,656.18 to CRB x4453 on May 26, 2023, yet Prime made no wire transfers to or for the benefit of Swan from CRB x9892 and only two ACH transfers to or for the benefit of Swan totaling $84.06 from CRB x4453, which had high volumes of other transactions throughout the day. *See id*. ¶¶ 203, 208–213.

[209]   *See id*. ¶ 213.

[210]   *See id*. ¶ 215.

[211]   *See id*. ¶¶ 214–215.

305.     As reflected in the bank records for this account, on May 30, 2023, the beginning balance of BMO x3077 was $150,794.09.[212]

306.     Even if one assumed that the entire beginning balance of BMO x3077 on May 30, 2023, included only fiat previously transferred to Prime by Swan, that would make Swan's total "balance" in BMO x3077 on May 30, 2023, $177,787.09 (*i.e.*, adding the beginning balance of $150,794.09 and Swan's transfer of $26,993.00).

307.     This means that the $10,098,531.94 transferred from Prime to or for the benefit of Swan on May 23, 2023, would have included $9,920,744.85 of fiat transferred that day by other Prime customers (*i.e.*, subtracting the beginning balance in BMO x3077 of $150,794.09 and Swan's transfer of $26,993.00 from the $10,098,531.94 transfer to or for the benefit of Swan).[213]

308.     Therefore, it is clear that Prime was commingling and transferring fiat into and out of BMO x3077 throughout the day from various accounts.[214]

309.     Swan's transactions with Prime on May 23, 2023, May 26, 2023, and May 30, 2023, illustrate that Prime commingled fiat in BMO x3077 from various internal and external sources (including Swan), on a daily or near-daily basis.  Thus, the Fiat Preferential Transfers that Prime transferred to or for the benefit of Swan from BMO x3077 were commingled fiat.[215]

---

[212]   *See id.* ¶ 221.

[213]   The Brennan Declaration states that Swan made several other incoming transfers to Prime on May 30, 2023 to CRB x9892, including one wire transfer totaling $200.00 and one ACH transfer totaling $100.00.  *See id.* ¶¶ 223–224.  Prime transferred $15,000,000.00 from CRB x9892 to BMO x3077 on May 30, 2023, therefore, a maximum of $300 that Swan transferred to the CRB x9892 may have been included in the outgoing wire transfers to or for the benefit of Swan from BMO x3077 that same day but cannot be directly attributed as such.  *See id.* ¶¶ 227.  If the $300.00 were included in the transfers from BMO x3077 to or for the benefit of Swan on May 30, 2023, then the $10,098,531.94 transferred from Prime to or for the benefit of Swan on May 30, 2023, would have included $9,920,444.85 of fiat transferred that day by other Prime bank accounts and customers.

[214]   *See id.* ¶ 221.

[215]   *See id.* ¶ 178.

**H.      Swan Cannot Identify the Fiat and Crypto It Transferred to Prime**

310.    Because Prime held fiat and crypto transferred to it from customers in an omnibus, commingled manner, Prime's own employees were incapable of determining where any fiat or crypto transferred by a particular customer to Prime was located.  As ███████ testified:

Q:      And you've now said—just to make sure we're talking the same language, omnibus, the structure, omnibus environment, omnibus product, is that all meaning the same thing, or what do you mean—

A:      It is.  It is. I don't like calling it any of those things.  I don't really know what else to call it, but it's basically the same thing, for the client to have an omnibus account.

Q:      And what does that mean to you, a client to have an omnibus account?

A:      It means that rather than having all their end users with a segregated account model to where each end user would have their own account at Prime Trust, all of their funds would be comingled in one account that's in the integrator's name.

Q:      And that was done at Prime Trust?

A:      It was done at Prime Trust.  It wasn't done very frequently, but there were— there were omnibus accounts at Prime Trust.

Q:      And do you know who was responsible for those accounts?

A:      I don't. There was probably ten or 12 accounts. . . While I was at Prime Trust it was very concerning to me and frustrating that nobody could ever tell me the exact number of omnibus accounts that the company allowed customers to have.· It was like an Easter egg hunt finding them.· It was not a clear, documented—I mean, it was a product offering.· I mean, you could have the segregated account model or this omnibus account model.· And it just was not clearly defined who was operating in an omnibus account and who those people were.[216]

311.    Another example of the confusion in tracing specific fiat and crypto that customers transferred to Prime is demonstrated in the below internal Prime correspondence from

---

[216]    ███ Dep., 205:19–207:3.

December 2022. In this correspondence, individuals at Prime attempted to respond to a request from Nevada FID asking Prime to identify which customers and which Omnibus Bank Accounts were impacted by Prime's use of customer-transferred fiat to purchase ETH to satisfy Abra's transfer requests:



312. ▮▮▮▮▮ responded that this task was impossible because "management considered all funds tangible in our omnibus model" and that "no bank movements were needed/done before the credits were requested to the ledger":

313.  ▮▮▮▮▮▮▮▮, Prime's former SVP and Head of Banking and Trust Operations, confirmed that Prime could not identify which customers provided which fiat or crypto and that Prime was "***not able to specify what customer is out the funds due to our omnibus structure***":

> On Wed, Dec 28, 2022 at 10:56 AM ▮▮▮▮▮▮▮▮▮▮ ?primetrust.com> wrote:
>
> ▮▮▮▮ and I met today.  We are in agreement that we are not able to specify what customer is out the funds due to our omnibus structure.  Please let us know if we need to have another conversation to align how to position this with the FID.

314.  The preceding subsections of this Section VIII, *supra*, largely describe Prime's rampant commingling of assets and poor recordkeeping procedures ***before*** individuals at Prime intentionally corrupted the Internal Ledger to conceal the purchase of replacement ETH to fill the hole caused by the inaccessible 98f Wallet.  *See* Section IV, *supra*.

315.  The actions undertaken by these individuals at Prime to falsify Prime's Internal Ledger and records only exacerbated the already-impossible task of attempting to trace and identify specific fiat and crypto held by Prime.

\*   \*   \*

316.  In sum, because of Prime's commingling of fiat and crypto, Prime's poor recordkeeping procedures, and the actions undertaken by certain individuals at Prime to intentionally corrupt Prime's Internal Ledger in response to the 98f Wallet issue, it is practically impossible for PCT, Swan, or anyone else to specifically identify all of the fiat and crypto that Swan originally had transferred to Prime.[217]

---

[217]  *See* Ex. B, Brennan Decl., ¶¶ 28–136; 248.

## IX.    Prime's Receivership and Chapter 11 Filing

317.    Both before and during the Preference Period, details about Prime's deteriorating financial condition—including several revoked state licenses, a failed merger attempt, the loss of several substantial customers, and even Prime's potential bankruptcy filing—leaked to the crypto and financial markets.

318.    For example, on June 8, 2023, CoinDesk reported that BitGo, another crypto custody firm, had reached a preliminary agreement to purchase Prime.[218]  CoinDesk's report specifically noted that "Prime Trust had been the subject of some speculation with people online suggesting the firm was facing bankruptcy."[219]

319.    On June 21, 2023, Nevada FID issued an Order to Cease and Desist from Violations of NRS 669 (the "Cease and Desist Order").  Nevada FID found that Prime was "operating at a substantial deficit and/or is insolvent and will not be able to satisfy all withdrawals."[220]  Nevada FID ordered Prime to cease accepting all fiat and crypto transfers.  *Id.*

320.    Two days after the Cease and Desist Order, BitGo canceled its acquisition of Prime. One report explained that Prime "ha[d] been losing clients and deposits to competitors for weeks amid mounting concerns over its business."[221]

---

[218]    *See* Ian Allison, *Crypto Custody Firm BitGo Reaches Preliminary Agreement to Buy Prime Trust: Sources*, COINDESK (Jun. 8. 2023).  *Available at*: https://www.coindesk.com/business/2023/06/08/crypto-custody-firm-bitgo-reaches-preliminary-agreement-to-buy-prime-trust-source/.

[219]    *Id.*

[220]    *See In re Prime Trust, LLC*, Order to Cease and Desist from Violations of NRS 669, Nevada FID (Jun. 21, 2023).  *Available at*:  https://fid.nv.gov/uploadedFiles/fidnvgov/content/Opinion/Prime%20Trust%20-%20C%20and%20D%206.21.23.pdf.

[221]    *See* Jamie Crawley & Danny Nelson, *Crypto Custody Firm BitGo Cancels Acquisition of Rival Prime Trust*, COINDESK (Jun. 22, 2023).  *Available at*: https://www.coindesk.com/business/2023/06/22/crypto-custody-firm-bitgo-cancels-prime-trust-acquisition/.

321.    On June 26, 2023, Nevada FID filed a Petition for Appointment of Receiver, Temporary Injunction, and Other Permanent Relief (the "Nevada FID Petition") in the Eighth Judicial District Court of the State of Nevada (the "Nevada Court").[222]  The Nevada FID Petition directed Prime to cease and desist all retail trust activities.[223]

322.    The Nevada FID Petition also contained factual findings made by Nevada FID that further corroborate the fact that Prime held fiat transferred to it from customers in commingled accounts.

323.    Specifically, Nevada FID found that "P[rime] purchased additional digital currency using customer money from its *omnibus customer accounts*."[224]

324.    The Nevada FID Petition concluded that Prime's "liabilities greatly exceeded its assets, and it is currently in a position wherein it would be unable to satisfy all withdrawals." *Id.* at 10.  Specifically, Nevada FID found that Prime "owe[d], in fiat currency, $85,670,000 to its clients but has $2,904,000 in fiat currency (equaling an $82,766,000 fiat currency liability)."[225]

325.    On July 14, 2023, the Nevada Court placed Prime under receivership.

326.    On August 14, 2023, Prime initiated the Chapter 11 Cases by filing its voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

---

[222]  *See Sandy O'Laughlin, in her capacity as Commissioner of the State of Nevada, Department of Business and Industry, Financial Institutions Division v. Prime Core Technologies, Inc., Prime Trust, LLC, Prime IRA, LLC, Prime Digital LLC*, No. A-23-872963-B (8th Jud. Dist. Ct. Nev. Jun. 26, 2023).    Available at https://business.nv.gov/uploadedFiles/businessnvgov/content/News_Media/Press_Releases/Prime%20Core%20Technologies%20et%20al%20Petition.pdf.

[223]  *Id.*

[224]  *Id.* at 6 (emphasis added).

[225]  *Id.* at 7.

## CAUSES OF ACTION

### Count I

### Avoidance of Preferential Transfers,
### 11 U.S.C. § 547(b)

327. PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

328. The Transfers were made on account of a demand by Swan.

329. Each of the Transfers was a transfer of an interest in property of Prime.

330. Prime made the Transfers to or for the benefit of Swan.

331. At the time of the Transfers, Swan was a creditor of Prime within the meaning of section 101(10) of the Bankruptcy Code. Swan received the Transfers, or, alternatively, the Transfers were made for Swan's benefit.

332. Each of the Transfers was made for or on account of an antecedent debt owed by Prime.

333. Each of the Transfers was made within ninety days of the Petition Date.

334. At the time of the Transfers, Prime was insolvent and Prime nonetheless is presumed to be insolvent during the Preference Period pursuant to section 547(f) of the Bankruptcy Code. If not avoided, the Transfers would enable Swan to receive more than Swan would have received in a hypothetical chapter 7 case had Prime not made the Transfers.

335. Swan has not repaid or returned any of the Transfers to PCT.

336. Pursuant to 11 U.S.C. § 547(b), PCT has conducted reasonable due diligence into the circumstances of the case and has taken into account the known or reasonably knowable affirmative defenses that Swan could assert, including Swan's potential defenses under section 547(c) of the Bankruptcy Code, and believes that certain of the Transfers are avoidable.

337.    Accordingly, PCT is entitled to recover from Swan no less than $22,432,573.14 USD, 11,992.64 BTC, 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, and 91,144 XRP of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

**Count II**

**Avoidance of Actual Fraudulent Transfers,**
**Del. Code Ann. tit. 6, §§ 1304(a)(1) and 1305 and 11 U.S.C. §§ 544, 548(a)(1)(A)**

338.    PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

339.    In the alternative to Count I, pursuant to sections 1304(a)(1) and 1305 of Title 6 of the Delaware Code and section 548 the Bankruptcy Code, PCT may avoid the Transfers as actual fraudulent transfers.

340.    On or within two (2) years before the Petition Date, PCT made the Transfers to or for the benefit of Swan.

341.    Each of the Transfers was a transfer of an interest in property of Prime.

342.    Each of the Transfers was made with an actual intent to hinder, delay, or defraud Prime's creditors.

343.    Further, multiple badges of fraud permeate each Transfer, including without limitation that:  (i) Prime was facing legal action, including from Nevada FID; (ii) the value of the consideration received by Prime was not reasonably equivalent to the value of the Transfers; (iii) Prime removed the Transfers from its platform and accounts at Swan's direction; (iv) Prime was insolvent at the time of or shortly after the Transfers occurred; and (iv) the Transfers constituted a large portion of Prime's assets and value for Prime's estate.

344.   The actual fraudulent transfers are avoidable pursuant to Bankruptcy Code section 548(a)(1)(A) and other applicable law, including the Delaware Uniform Fraudulent Transfers Act, Del. Code Ann. tit. 6, §§ 1301, *et seq.*

345.   Accordingly, each of the Transfers to or for the benefit of Swan should be avoided as actual fraudulent transfers pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(1) and 1305, and 11 U.S.C. §§ 544 and 548(a)(1)(A), and PCT may recover from Swan the full amount of the Transfers, plus interest thereon at the maximum legal rate, and costs and fees to the fullest extent allowed by applicable law.

### Count III

**Recovery of Avoided Transfers from the Defendant,**
**11 U.S.C. § 550**

346.   PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

347.   PCT is entitled to avoid preferential transfers and/or actual fraudulent transfers described above pursuant to sections 547(b) and/or 548(a)(1)(A) of the Bankruptcy Code.  Swan was the initial transferee of such Transfers, or the immediate or mediate transferees of such initial transferees, or the entity for whose benefit such Transfers were made.

348.   Accordingly, pursuant to section 550 of the Bankruptcy Code, PCT is entitled to recover from Swan: no less than $22,432,573.14 USD, 11,992.64 BTC, 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, and 91,144 XRP of the Transfers as preferences pursuant to section 547(b) of the Bankruptcy Code, or in the alternative, the full amount of the Transfers of no less than $24,656,266.14 USD, 11,994.08 BTC, 4,999,998.24 USDT, 9,234.91 USDC, 0.01 ETH, and 91,144 XRP as actual fraudulent transfers pursuant to section 548(a)(1)(A) of the Bankruptcy

Code, plus interest thereon at the maximum legal rate and costs to the fullest extent allowed by applicable law.

## Count IV

**Claim Objection,
11 U.S.C. § 502**

349. PCT repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

350. Swan has not filed any claims in these Chapter 11 Cases.

351. As alleged above, Swan was the initial transferee of the Transfers, or the immediate or mediate transferee of such initial transferees, or the entity for whose benefit the Transfers were made, and PCT is entitled to avoid the Transfers described above pursuant to sections 547(b) and/or 548 of the Bankruptcy Code, which are recoverable from Swan under section 550 of the Bankruptcy Code.

352. Pursuant to section 502(d) of the Bankruptcy Code, any claim(s) of Swan that have been or will in the future be asserted in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned) must be disallowed unless and until Swan pays PCT the value of the Transfers, for which and to the extent that the Court has determined Swan is liable pursuant to 11 U.S.C. § 550.

## **PRAYER FOR RELIEF**

**WHEREFORE**, PCT requests that this Court grant the following relief:

A.      Enter an order finding that the Transfers are avoidable preferential transfers under 11 U.S.C. § 547 and/or avoidable actual fraudulent transfers under 11 U.S.C. § 548 and Del. Code Ann. tit. 6, §§ 1304, 1305;

B.      Award PCT: (a) the return of property to the Debtors' bankruptcy estates that is the subject of the avoidable preferential transfers and/or actual fraudulent transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable preferential transfers and/or actual fraudulent transfers alleged herein, plus the value of any additional avoidable transfers that PCT learns, through discovery or otherwise, were made to or for the benefit of Swan;

C.      Enter an order pursuant to 11 U.S.C. § 502(d) disallowing any and all claim(s) filed or held by Swan against the Debtors in these Chapter 11 Cases (regardless of whether or not the claim(s) were assigned), unless and until Swan relinquishes to PCT the amount ordered as an award for avoidable transfers;

D.      Award PCT its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

E.      Grant PCT all other relief, at law or equity, to which it may be entitled.

Dated: May 15, 2026
      Wilmington, Delaware

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ David R. Hurst*
David R. Hurst (No. 3743)
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Telephone: (302) 485-3900
Facsimile:  (302) 351-8711
Email:     dhurst@mcdermottlaw.com


-and-

Darren Azman (admitted *pro hac vice*)
Joseph B. Evans (admitted *pro hac vice*)
James A. Pardo (admitted *pro hac vice*)
J. Greer Griffith (admitted *pro hac vice*)
Benjamin F. Cooper (admitted *pro hac vice*)
Patrick V. Kennedy (admitted *pro hac vice*)
Cris Ray (admitted *pro hac vice*)
Magali M. Duque (admitted *pro hac vice*)
Joseph M. Aminov (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile:  (212) 547-5444
Email:     dazman@mcdermottlaw.com
           jbevans@mcdermottlaw.com
           jpardo@mcdermottlaw.com
           ggriffith@mcdermottlaw.com
           bcooper@mcdermottlaw.com
           pkennedy@mcdermottlaw.com
           cray@mcdermottlaw.com
           mduque@mcdermottlaw.com
           jaminov@mcdermottlaw.com

*Counsel to Plaintiff PCT Litigation Trust*